FITZHUGH *et al. v.* CITY OF JACKSON *et al.*

Division B. July 2, 1923. Suggestion of Error Overruled. July 21, 1923.

[97 South,, 90.. No. 23265.]

1. INJUNCTION. *Injunction will lie to stay enforcement of void municipal ordinance.*

Where a municipal ordinance is void and its provisions are about to be or are being enforced, a person injuriously affected thereby, either in his person or the use of his property, may resort to a court of equity to have the enforcement of the ordinance stayed by injunction.

2. CONSTITUTIONAL LAW. *Police power of state subordinate to owner's natural right to legal acquisition and use of his property.*

The right to acquire and use one's property as the owner chooses, so long as the use harms nobody, is a natural right to which the police power of the state is subordinate.

3. MUNICIPAL CORPORATIONS. *Ordinance prohibiting erection of building for business purposes or conducting business in residential portion of municipality not within its "police power."*

It is not within the police power of a municipality to enact an ordinance prohibiting the erection of a building for business purposes or the conducting of a business in a residential portion of the municipality.

APPEAL from chancery court of Hinds county.

HON. V. J. STRICKER, Chancellor.

Suit by J. L. Fitzhugh and others against the City of Jackson and others. From an order sustaining defendants' demurrer and dismissing the bill, plaintiffs appeal. Reversed and decree rendered.

*Franklin & Easterling* and *Alexander & Alexander,* for appellant.

The demurrer filed by the defendants raised the question that complainants had a perfect remedy at law by mandamus and it was argued in the court below that mandamus and not bill in equity for injunction was the proper mode of procedure for complainants. The rest of the demurrer asserts the validity of the ordinance in question. To our mind bill in equity under the facts set forth in the instant case is the proper mode of procedure and is the only mode whereby complainants could secure perfect and complete relief. We deem this proposition thoroughly and conclusively settled in this state. Certainly in cases of this kind such procedure is held by the weight of authority to be proper.. The following cases, we submit, are conclusive and overwhelming on the right to remedy by injunction. *Quintini* v. *Bay of St. Louis,* 64 Miss. 483, 1 So. 625, 60 Am. Rep. 62; *Pieri* v. *Shieldsboro,* 42 Miss. 493; *Floyd* v. *Adler,* 96 Miss. 544, 51 So. 897; *New Orleans Baseball & Amusement Co.* v. *City of New Orleans,* 118 La. 228, 42 So. 784; 118 A. S. R. 366, and extensive note and citation of authorities thereunder. A long list of authorities are cited in support of the text to the note including decisions from Georgia, Illinois, Indiana, Maryland, New York, Pennsylvania, Missouri, and Texas. The following cases reported in the Trinity Series are cited: 68 A. S. R. 155; 33 Am. Rep. 239; 45 A S. R. 339; 47 A. S. R. 114; 29 Am Rep. 105; 51 A. S. R. 566; 33 Am. Rep. 239.

We come now to the validity *vel non* of the ordinance. A perusal of this ordinance, to our mind, will show a most thorough and complete disregard of our State and Federal Constitutions. To our mind it would be difficult to find any ordinance so totally unreasonable, arbitrary, and at variance with our theory and form of democratic government.

At the outset we desire to call the court's attention to certain fundamental principles to be considered in passing on the validity *vel non* of municipal ordinances. In the case of *A. & V. R. R. Co.* v. *Turner* (Miss.) 52 So. 261, this court held that municipalities act under limited power and must find their authority clearly given in the law, and when so found they must follow the law. It has been held that powers delegated to municipalities by the legislature are intended to be exercised in conformity to and consistent with the general laws of the state. *Crittenden* v. *Booneville,* 92 Miss. 277, 45 So. 723; 131 A. S. R. 518.

Cities stand on equal footing with other private corporations in this respect. They have no powers except such as are delegated to them by the state, either expressly or by necessary implication, and there is no distinction in this respect between governmental powers and those of a private nature. *Hazlehurst* v. *Mayes,* 51 So. 890; *Steitenroth* v. *Jackson,* 54 So. 955; *Wise* v. *Yazoo City,* 96 Miss. 507, 51 So. 453, 26 L. R. A. (N. S.), 1130. Municipalities get their power from legislative grant. Chapter 1440 of Hemingway's Code, is devoted exclusively to municipalities. Therein you will find their powers and their limitations. Any usurpation of power must be tested by the letter of the law granting life itself to the municipality. Section 5816 of Hemingway's Code, under the head of "Nuisances and Cognate Matters," gives to municipalities power to secure the general health of the municipality. Section 5826 of Hemingway's Code confers the power to make all needful police regulations necessary for the good order and peace of the municipality. There are other sections in the same chapter devoted to

the particular subject of police regulations, but each power is specifically conferred by law and nothing is left to municipal discretion except within the limits pointed out by the constitutional authority.

Our supreme court in the case of *Quintini* v. *Bay St. Louis,* 64 Miss. 383, 1 So. 625, 60 Am. Rep. 62, held that a private dwelling house may not be declared a nuisance by the authority of the legislature simply because it might injure adjoining property by cutting off the breeze from, and the view of, the sea.

A case altogether on all fours with the case now before the court is that of *Spann* v. *Dallas,* 235 S. W. 513, reported in the 19 A. L. R. 1397. The Spann case, as the court will observe, refers to all the leading cases on this question and draws a distinction between the decisions passed upon, regarding police power. This is the last word on this subject. It clearly settles the proposition that legislative action is necessary before such broad sweeping laws or ordinances could be enacted by the municipality. Massachusetts had to have its Constitution amended in order to put this doctrine into effect, and we submit that before any such ordinance as the one here before the court can be effective, our own Constitution would have to be amended, and under the sanction of such amendment, a legislative act be passed vesting such power and authority in a municipal government. But such an amendment has not been made to our Constitution, and we hope it never will. For the leading cases dealing with this subject we refer the court to the annotations under 19 A. L. R., pages 1395 to 1399. See also *Willison* v. *Cooke,* 54 Colo. 320, 44 L. R. A. (N. S.), 1030, 130 Pac. 828.

When we first read this ordinance we were impressed with the absurdity of the idea that any man should be limited in the use of his property by the whim or caprice of the owners in a circle eight hundred feet in diameter from the center of the lot in question, but to cap the climax, by section 4 of said ordinance, it is provided that, "all structures constructed or altered to violate the terms

hereof shall be nuisances, and be removed by the police department of the city." If this ordinance is valid, then the mayor and board of aldermen of every petty village in the state possess the same power and can at will prohibit any new building for business purposes, or any new business being established in such town or village, and thereby solemnly ordain, declare and perpetuate every line of business into a permanent monopoly.

In connection with the foregoing the court will recall the *O'Leary case,* 65 Miss. 80, 3 So. 144, 7 A. S. R. 640, and the *Comfort case,* 88 Miss. 611, 41 So. 269. In the O'Leary case that celebrated jurist, Judge CAMPBELL, in dealing with an ordinance under which Mrs. O'Leary was convicted which declared that all hog pens or lots used as such "are hereby declared a nuisance and shall be abated," says: "It is too broad and sweeping in its provisions and is invalid. Hogs in the city of Jackson, may or may not be a nuisance, and any ordinance on such should be framed accordingly. Wood on Nuisances, section 518." Likewise, in *Johnson* v. *Town of Philadelphia,* 94 Miss. 34, 47 So. 526, 19 L. R. A. (N. S.), 637, this court, speaking through Judge MAYES, held that a skating rink is not a nuisance *per se* and cannot be made so by municipal ordinance. See Freund on Police Power, sections 63 and 158. The absurdity of the ordinance in question is magnified by the provision that "all structures constructed or altered to violate the terms hereof shall be nuisances and to be removed by the police department of the city." It can thus be seen that the city authorities by the ordinance in question have attempted to declare any building constructed or altered contrary to the terms of that ordinance public nuisances *per se* and to be summarily destroyed. This could not be done by the legislature itself under the decisions of this court, much less by a municipality which draws all of its powers from charters conferred by the legislature.

*Green & Green* and *W. E. Morse,* for appellee.

REMEDY AT LAW ADEQUATE. The failure of the city

commissioners to issue the building permit applied for by the appellant, was and is, if failure it be at all, a refusal to perform a duty in virtue of their office wherefor mandamus was and is the exclusive remedy. The chancellor so held, and his holding is so manifestly correct upon this point that we, with deference, hesitate to discuss the very fundamental Constitutional question involved in the construction of the ordinance under the well-settled rule that no one has a right to have a constitutional question determined unless it is requisite for the protection of his rights. Such is not the case here. *Perry* v. *Lake,* 54 Miss. 542, should control here. See also *McCutcheon* v. *Blanton,* 59 Miss. 116.

ZONING A NECESSARY EXERCISE OF POLICE POWER. This cause was presented upon application of appellant for a mandatory injunction seeking thereby the avoidance of the zoning ordinance of the city of Jackson.

The property is urban, located in a thickly settled residential area upon one of the choicest residence streets in Jackson, and the business there sought to be conducted is isolated from the business district, rather from police supervision, located in a neighborhood where its presence is not desired. Does the police power reach it?

The business sought to be conducted is that of a corner grocery store, vending commodities deleterious to child life, but displayed with as much attraction as possible, to inveigle the small purchasers into parting with their nickles. In short, candy, cakes, drinks, are a part of the stock in trade and the customers are the children of the adjoining families. These families now have their own residences adjoining and contiguous, wherein these children are being brought to manhood and womanhood, and that which makes these houses valuable chiefly to their owners, is their suitableness for transforming their children into the men and women competent and capable, of whom the state may be proud. With these residences thus fixed, the contention of appellant is that it may offer in the most attractive form to these children things which

we now know will undermine their health, and make of them a burden to themselves and to the community in their future years. With modern knowledge of the effect upon the constitution of sugar in its multiform condition, we are here concerned: It will undermine the children's health by impairing their digestion, destroying their teeth, and, in some instances, absolutely taking their lives through false feeding. The question here presented is, Will the state perform its correlative duty by aiding the parents, where it can, to produce men and women physically fit?

The council in Jackson acted in this case and declared, in virtue of its action, that it based the same upon the police power. Such a protection of the American home is requisite, due to the falling off of the birth rate and the necessity of protecting those who remain.

Zoning ordinances are in force in Alabama, Arkansas, Arizona, California, Connecticut, District of Columbia, Georgia, Illinois, Indiana, Iowa, Kansas, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, Ohio, Oregon, Oklahoma, Pennsylvania, Tennessee, Texas, Virginia, Washington and Wisconsin.

Child welfare is thus the fundamental factor which demands the first attention of this court as to the exercise of police power.

These residences in this area have been erected and ornamented, fences have been removed and beauty has been sought to be obtained by the women who make of these houses homes. Given the right to do so, they have expended of their own, to the public welfare, that there might be a street of which the city—the state—might be proud. Beauty has been integrated into the law and with the advent of the woman as a qualified constitutional voter, that which appeals to the aesthetic is going to find a safe and secure harbor in the law. The enfranchisement of those who have this integrated into their own nature means that they will imbed it in the law, because the law is but a composite expression of those who live thereunder, framed for the welfare of the whole.

Without the store, these houses are worth seventy-five per cent more as homes than they are with the store actually, physically invading thir property rights. The city is interested in the preservation of values upon which to raise taxes, and being so interested will it suffer actual values to be destroyed that a commercial enterprise may for a time prosper and then after prospering, fail when it has destroyed the residential neighborhood?

A grocery store, wherefrom is vended meat, milk, and green goods, of necessity acquires an unsavory odor, one which is not confined to the lot whereon it is located. Nearly all of the commodities handled are subject to decay, and must be therefrom removed. While contained therein, they, of necessity, give forth these obnoxious odors destroying in a measure, but withal effectually, the value of the property for residential purposes. Likewise, there is about a store, the assembling of persons so that the privacy of the homes is in large measure destroyed, and the destruction of privacy is the end of modesty. Again, noises will occur in and about the distribution of such commodities. Litter increases about stores to a far greater extent than about residences and the danger of fire is largely increased thereby.

Having a store of this kind in a residential area in our southern country means the mixing to a greater or less extent of the two races by giving the negroes a right and just cause to go into a white district and there purchase their commodities. As evidenced by our separation acts, segregation is a proper policy.

Now these factors were passed upon by the council and having been passed upon, they gave expression as a finding of fact to the declaration that this power was the power of preservation and must be asserted to the rectification of the condition, and in so doing acted legislatively. See *Perley* v. *North Carolina*, 249 U. S. 514, 53 L. Ed. 738; *Armour & Co.* v. *North Dakota*, 240 U. S. 510-517, 60 L. Ed. 771-776; *Dominion Hotel* v. *Arizona*, 249 U. S. 268, 63 L. Ed. 598; *Cusack* v. *Chicago*, 242 U. S. 526, 530, 61

L. Ed. 472, 476, L. R. A. 1918 A; 136 Ann. Cas. 1917C, 594.

Here the legislature, speaking through the council, has acted and the question presented is, Shall those elected to discharge this function be by this court declared unfaithful to their trust when they have done that which to them seemed wisest? We cite these decisions: Bouvier's Law Dictionary, Vol. 3, 2750; *Chicago* v. *Wells,* 23 L. R. A. (N. S.) 407.

Again, the aggregate rights guaranteed and protected by government in things vary as the exigencies of the general welfare require. Nothing could be more sacred than the rights centered in a home, but in *Levy Leasing Co.* v. *Spegel,* U. S. Adv. Sheets, October, 1921, p. 326, it was held that land was appropriate when requisite, under the police power, to conserve the emergency situation resulting from the world war. *Block* v. *Hirsch,* 256 U. S. 135; *Marcus Brown Company case,* 256 U. S. 198; *Stafford* v. *Wallace, U. S. Adv. Sheets,* 474, 66 L. Ed. —. This limitation of rights is made by sovereign power—police power—the right to govern. This is a government of laws, and being a government of laws, it strictly prescribes what utilization may be made of the things subject to its dominion, by its people. No person has an absolute right to a thing, absolutely, under all conditions. Austin's Jurisprudence, Vol. 3, p. 7; 22 R. C. L., 39.

Without law property would not be; only in virtue of law has property become. What once was property ceases to be property when the general welfare of the people so demands. *Mugler* v. *Kansas,* 123 U. S. 623; *Purity Extract, etc., Co.* v. *Lynch,* 236 U. S. 184; *Lottery Cases,* 188 U. S. 60.

In short, this case goes back to *Munn* v. *Illinois,* 94 U. S. 77, and places land in a city upon precisely the same basis as was placed the doing of warehouse business in that decision. There the legislature prescribed what rent should be returned from the doing of a business and if this power there existed, equally does the right to prescribe what business shall be thereon done. The only things un-

der the Constitution that a citizen holds are the rights given by common law, coordinated with public welfare.

The coordination of individual right with the general welfare in former years was a matter easy of solution when one's nearest neighbor was ten miles away, but at the present day when the government is called upon to protect against evil influence undermining the home, individual right must be subject to the general welfare in virtue of the police power. *St. Louis Poster Company* v. *St. Louis*, 249 U. S. 274. An able review of the statutes in the Federal supreme court is to be found in *In re Opinion of the Justices*, 127 N. E. 529 (Mass., 1920).

We, therefore, submit under the Federal constitution that this ordinance is valid.

Where a great number of states act in one particular way upon one particular theory, such action strongly impresses the judiciary with the fact that the regulation is proper. *German Alliance Ins. Co.* v. *Lewis*, 233 U. S. 412, 58 L. Ed. 1022; *Hamilton* v. *Kentucky Distilleries*, 251 U. S. 161, 64 L. Ed. 202.

Therefore, with this statement of the rule in the Federal supreme court, we feel absolutely confident that this ordinance falls clearly within the reserve police power whose exercise is rendered requisite by present day exigencies, In every state of the union, substantially is it being invoked. 19 L. R. A., p. 1395; Dillon on Municipal Corporations, 1058. See also section 695. See also 20 Harvard Law Review, 1906, 42, and cases cited, and also cases cited in *Passiac* v. *Paterson, etc.*, 72 M. J., 285; *Commission* v. *Prichard*, 116 Atl. (Pa.), 1922, 315; *Cliffside Park Realty Co.* v. *Borough of Cliffside Park*, 114 A. (N. J.) 797; *Lincoln Tr. Co.* v. *Williams Bldg. Corp.*, 229 N. Y. 316; *Biggs* v. *Steinway & Sons*, 128 N. E. (N. Y.) 211; *People* v. *Board of Appeals*, 189 N. Y. Supp. 772; *Bebb* v. *Jordan*, 189 Pac. (Wash.), 555; *Farmers' etc. Co.* v. *Mayor*, 111 Atl. 114; *Chicago etc.* v. *Stratton*, 35 L. R. A. 86; *Village of Westville* v. *Rainwater*, 128 N. E. (Ill.), 493; *In Re Montgomery*, 31 Am. & Eng. Ann. Cas. (Cal.), 130; *Ex parte Hada-*

*check* (Cal.),. 132 Pac. 584; *U. S.* v. *Richards,* 35 App.
Cas. (D. C.), 540; *Chicago* v. *Stratton,* 162 Ill. 494, 44 N.
E. 853, 53 Am. St. Rep. 325, 35 L. R. A. 84, reversing 58
Ill. Rep. 539; *United States* v. *Richards,* 35 App. Cas.
(D. C.), 540; *Ex parte Quong Wo,* 161 Cal. 220, 118 Pac.
714, 1917 F. L. R. A., 1054 et seq; *Myers* v. *Fortunato,* 110
A. (Del.) 847; *English* v. *Asbury Park,* 115 A. (N. J.) —;
*Brown* v. *City of Los Angeles,* 192 Pac. (Cal.), 717; *City
of Des Moines* v. *Manhattan Oil Co.,* 184 N. W. 828; *Comm.*
v. *Alger,* 7 Cush. (Mass.) 53; *Wadleigh* v. *Gilman,* 12 Me.
403, 28 Am. Dec. 188.

That the state may directly, or through delegation of
authority to municipalities, adopt and enforce reasonable
regulations concerning the use and occupation of real
estate in cities and towns, is too well established to ad-
mit of serious dispute. *Salem* v. *Maynes,* 123 Mass. 373;
*State* v. *Houghton,* 142 Minn. 28; 170 N. W. 853; *Com.*
v. *Parks,* 155 Mass. 531; *Reinman* v. *Little Rock,* 237 U.
S. 171, 35 Sup. Ct. 511, 59 L. Ed. 900; *Barbier* v. *Connolly,*
113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923; *Welch* v.
*Swasey,* 193 Mass. 364, 79 N. E. 745, 118 A. St. Rep. 523,
23 L. R. A. (N. S.) 1160.

The location of garages and the storing of oil and gaso-
line are proper subjects of police regulation. See *Whitte-
more* v. *Baxter,* 181 Mich. 564, 148 N. W. 437, 52 L. R. A.
(N. S.) 930, Ann. Cas. 1916 C, 818; *People* v. *Ericson,* 263
Ill. 368, 105 N. E. 315, L. R. A. 1915 D, 607 Ann. Cas.
1915 C, 183; *Standard Oil* v. *Danville,* 199 Ill. 50, 64 N.
E. 1110; *State* v. *Durnberger,* 187 N. W. (Minn.) 973;
*State* v. *Haughton,* 176 N. W. —, 8 A. L. R., 585.

An article in the American Bar Journal, of August,
1922, gives a full discussion of this question, the con-
cluding paragraph of which is very pertinent. "It is
very evident that we are living in a time of development
of the police power in reference to this subject-matter. The
definition of Justice HOLMES of the United States su-
preme court has become a classic: 'It may be said in a
general way that the police power extends to all the great

public needs . . . It may be put forth in aid of what is sanctioned by usage or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare.'

"The police power therefore is not static but progressive. It moves with the movement of public opinion.

"The supreme court of the United States in upholding regulation of rent by Washington and New York City has sanctioned what seems to many a startling extension of police power. In one of the cases on that subject Justice Holmes said: 'Circumstances might so change in time as to clothe with a public interest what at other times would be a matter of purely private concern.' He referred to different modes of exercise of the police power such as the limitation of the height of buildings and the regulation of bill boards. Then he drew the following conclusion: 'But if to answer one need the legislature may limit height, to answer another it may limit rent.' The logic is equally strong that if the legislature may limit height it may regulate the type of a building of its location on a lot. This in fact is a less drastic regulation than the regulation of rent.

"Does all this seem revolutionary, dangerous to any traditional believer in private property? It is to be hoped that it does not, because only as private property is willing to consent to such modifications as experience may show to be necessary to the general welfare, can it justify itself. Never before was the truth so manifest, from so many different angles that no man liveth unto himself. Can it then be admitted that a man has a natural right to make himself a cause of offense to his neighbor by disregard of the simple amenities of fitness in the use of property? Never also was it clearer that man does not live by bread alone. The craving for beauty was not planted in the human heart for nothing; it is one of the highest impulses of man's nature. It was meant to be realized and we cannot—the law which is our instrument

cannot—permit it to be thwarted in the name of private property."

*Alexander & Alexander,* in reply, for appellant.

The only question seriously presented is the constitutionality *vel non* of the ordinance in question. In order to justify the defense of constitutionality, appellee seeks to draw so dark a picture of the evils of the grocery that the court will instinctively pronounce the ordinance a reasonable exercise of police power.

Counsel seeks to raise the question of reasonable regulation by assuming that there is involved the safety, health and morals of the community. He assumes for example that a grocer will sell sugar or its products to children and that it will destroy their teeth. If sugar, proverbial embodiment of sweetness and universal simile of personal charm and amiability, shall be judicially determined to be such subtle toxin and to possess such remarkable powers of exterminating all dental impedimenta, we would that complainant had sprinkled the offensive ordinance therewith that its vicious fangs may have been removed.

If the rather unique arguments of appellee lead us into by-paths of speculation our right to a reply in kind will we hope justify similar incursions.

"The cupidity of commercialism!" Such is the motive charged to our humble complainant. Thus is ambition stained with the hue of avarice. Such a flamboyant phrase could hardly stretch its length upon the modest shelves of a green-grocer, much the less could such a motive be nurtured to maturity beneath the shadow of a seven and a quarter hat. Counsel calls upon the state to perform its solemn duty to the parents by aiding them in "producing children physically and mentally fit." Is the corner-stone of a contrary fear the modest store of complainant? It is elemental that it will thrive only in direct proportion to its ability to supply physical needs. There is authority

for the adage that men are what they eat. Why assume that our complainant is one who thrives upon a steady diet of bad eggs? That he will be a buoyant menace upon the perturbed seas of gastronomical insurrection?

What is the picture that appellee suggests by bold impressionistic outlines, disdaining all details? Is it of fair-haired boys and girls arrested in a mad orgy of vanilla wafers by spasms of delirium? Is it of a palace of delusion where the wayfarer, demanding corned-beef is given a stone, and for cabbage is sold a scorpion? Shall we supply the details of Young America barred from a promised land of adolescent health by a barrier of "all-day suckers?" Is that lurid flash of color, which appellee spreads with nonchalant gesture, but an impressionistic picture of a domestic armory to which vengeful viragos repair for rolling-pins and persecuted spouses submerge their nuptial woes in flagons of sarsaparilla?

Perhaps between the lines of appellee's bold indictment there may be read a harsh philippic against a veritable hole of Hades where Cerberus, now masked as a brindled purring tabby, keeps loyal vigil while faithless, truant husbands abandon themselves to the bacchanalian excesses of the checker-board. We seem to catch a vision of debauched youth minus nickel, plus pickle, staggering homeward after twilight in the last stages of auto-intoxication.

Counsel calls the court's attention to Modern America, whose transient teeth find, amid the cosmopolitan habitues of the dresser top, nocturnal recreation from the exacting demands of alien mouths. Besides this picture he draws the deadly parallel of mummified royalty by whose complete assortment of upper and lower maxillaries modern science calculates the years, and aided by the astute genius and instinct of the horse trader wrests from the secrets of the sarcophagus the truths which dead lips would not divulge. Thus does he contrast the dental with the accidental, and concludes with a triumphant *"quod erat demonstrandum"* that there were no corner groceries along

the ancient streets of Cairo.  It is by similar reasoning that modern science would deduce from the absence of telegraph wiring, that the Pharaohs spoke by radio.

Hear the verbiage of another count in the merciless arraignment: "As soon as this commercialism gets started with its poison (sic) all of that vicinity becomes infected and ultimately as a residence district it will pass."  Thus counsel dips the brush of imagination into the pigments of prophecy and sketches from a model long since relegated to the comic supplement.  It is of that mongrel manor-house which the swarthy Sicilian made his castle and his commissary.  Where, shrouded with the odors of authority and garlic, he sat upon the throne of an up-ended hogshead and made of a cracker box his foot-stool.  Justice was typified by his balanced scales, and fraternity was fostered by free-lunch.  The red bandana was his national banner; the yellow banana was its "strange device."

With his own hands did he make his living, for did he not with each pound of wienerwurst sell also the weight of his rotund palm which by its tardy removal from the scales, made common cause to magnify the measure.  Thus did he sell himself to the public—pound by pound.  With a penny you could purchase a bit of cheese and have the thoughts of the proprietor as lagniappe.  You made business inquiry of the price of his liver; he made personal inquiry touching the condition of yours.

Democracy was engendered about the common boon of a barrel-stove.  Ranged in solemn circle with up-tilted chairs, the Sanhedrin of the sawdust-box determined national issues and neighborhood complexities with generosity and finality.  Each winter's eve was field-day for open competition in feats of expectoration, the events including speed, accuracy and endurance.  With hands, otherwise unemployed, the whittlers of red cedar practiced crude wood-sculpture as they lay bets for the coming old-fiddlers' contest.  Are these to be among the "unusual

assemblages of persons clustered about" the complainant's "commercial enterprise?"

And yet again, "Noises will occur in and about the distribution of such commodities." What is the scene he would suggest? Is it the old home town with its rearing horse and ribald hints for its pacification? Mayhap in the stilly hours of the night the hot-dogs will bark defiance at the cat-nip. Or an elite sardine more exclusive than its fellows will wail boisterous complaint against the extremes of democratic intimacy to which he is subjected. There will be outbursts of racial hatred as the sable eggplant seeks to justify its intrusion into a crate of new-laid eggs upon etymological rather than ethnological grounds. What more natural than the incessant imbroglio between the Irish potato and the English pea? No constitutional guaranty would stand against the upheaval resulting from a riot of Hibernian tubers against the immigration of the Bermuda onion upon equal terms.

Such is the picture, born of an imagination stimulated by the enthusiasm of appellee's advocacy. Such possibilities could be indefinitely enlarged with little strain upon the imagination.

Why not rather depict a shop where all is clean and fresh; where luscious legumes hang in soft festoons adrip with their original dew, and cool comestibles gaze defiance at the summer's sun through the frosted windows of a modern ice-box. A place whence the hungry housefly wheels its famished flight and joins the pilgrimage of germs to more productive fields. Where the anxious housewife may make hasty provision for the eleventh-hour guest with the nonchalance of full preparedness. Where amid modern merchandising methods the child, secure from the greasy appurtenances of congested industry, may spend its penny reward by and with the advice of the proprietor and the consent of the parent.

Argued orally by *Julian P. Alexander,* for appellants and *Garner W. Green,* for appellees.

SYKES, P. J., delivered the opinion of the court.

The bill of complaint of the appellant in effect alleges: That appellant J. L. Fitzhugh is now and has been for several years engaged in the business of conducting and operating a grocery store. That he has purchased a lot on the corner of State and Carlisle streets in the city of Jackson, upon which lot he expects to erect a suitable, proper, and lawful brick building in which to conduct and carry on the retail grocery business, which will be conducted in a proper and lawful manner. That he has made arrangements to erect this building, engaged a contractor, and put material upon the ground. He applied to the city through its proper officials for a permit to erect the building, and fully complied with all the rules and regulations with reference thereto. That he offered to pay the proper fee for the permit. This permit was refused him. The ground of refusal is because the city has passed an ordinance, commonly termed a zoning ordinance, which in effect prohibits the conducting of any business enterprise within the residence part of the city, unless the residence and property owners within a certain area of the place where the proposed business is to be conducted petition or consent thereto in writing. The material parts of this ordinance, necessary to be considered, are herein set out in full and are as follows, viz.:

"An ordinance to vouchsafe protection to residential areas within the city of Jackson, Mississippi, and to that end establishing residential zones wherein business enterprises shall be unlawful.

"Be it ordained by the council of the city of Jackson, Mississippi:

"Section 1. That protection of the homes of the people is of the utmost importance to the public welfare and is an all-sufficient predicate for the exercise of the police power in accordance therewith. That all residential areas, within the city, shall be protected from the encroachment of business enterprises of every character and that here-

after it shall be unlawful within such residential areas to erect any character or structure whatsoever for business enterprises, even though the same might be in part used for residential purposes.

"Section 2. That it shall hereafter be unlawful, within residential areas, to start any new business enterprise of any character that does not now exist, and further shall be unlawful to so alter any residence within such area so as to make of it a structure the erection whereof hereunder would be unlawful.

"Section 3. That any person desiring within said residential area may, if he desire to erect any such structure, conduct any such business or alter any such building may do so upon compliance with this condition, that he shall first obtain consent thereto in writing from persons actually owning in fee more than one-half in superficial area of a circle whose radius is four hundred feet and whose center is at the center of the lot whereon said proposed operation is to be, all street areas, public property and business property shall be excluded and where there is more than one owner, each owner shall have power to consent only for the proportion. After such petition shall have been signed by such persons, it shall be presented to the city clerk to remain on file for two weeks and thereafter the prayer of such petition may be granted by ordinance of the council, in whole or in part, or refused and there may be prescribed such conditions as may seem proper in the order allowing the use.

"Section 4. That any person violating any term of this ordinance shall be guilty of a misdemeanor and punished, as such as provided by section 452 of the Revised Ordinances of 1920 of this city, and all structures constructed or altered to violate the terms hereof shall be nuisances and be removed by the police department of the city.

"Sction 5. That this ordinance take effect and be in force from and after its passage."

The bill asks that the city be enjoined from enforcing this ordinance, alleging that it is void and that the proper

city officials be required to issue the proper building per-
mit.

A demurrer was interposed by the city and sustained
by the chancellor. The appellants declined to amend, the
bill was dismissed, and this appeal here prosecuted by
complainant.

It is first insisted by the appellee that appellant's rem-
edy was by mandamus and not by bill in chancery. The
bill in this case seeks to have declared void this city ordi-
nance because it is not within the police power of the
city to enact it; that this void ordinance interferes with
the lawful proper use of his lot and proposed building.

While there are some authorities to the contrary, the
great weight of authority and the better reasoned cases
hold that, where a municipal ordinance is void and its pro·
visions are about to be enforced, or are being enforced,
any person who is injuriously affected thereby either in
his person or the use of his property may go into a court
of equity to have the enforcement of the ordinance stayed
by injunction. *New Orleans Baseball & Amusement Co.
v. City of New Orleans,* 118 La. 228, 42 So. 784, 7 L. R. A.
(N. S.) 1014, 118 Am. St. Rep. 366. In passing on an
ordinance in some respects similar to the one here in ques-
tion, this court in the case of *Quintini* v. *City of Bay St.
Louis,* 64 Miss. 483, 1 So. 625, 60 Am. Rep. 62, stated that:

"The fact that in declaring buildings of the character in
question nuisances the municipal authorities have also
provided that persons who erect them may also be prose-
cuted in the courts of the town does not preclude relief by
injunction. The ordinance, as we have said, is an at-
tempted dedication of private property to public uses with-
out due compensation first made, and this a court of
chancery has jurisdiction to prevent. It is immaterial
that the exercise of this power will, as a consequence, pro-
tect the owner from criminal prosecution."

See, also *Pieri* v. *Mayor & Aldermen of Shieldsboro,* 42
Miss. 493.

The serious question presented is whether or not the city,

under the police power, had the right to pass this ordinance; if it does not come within the police power, then the ordinance of course is void.

It is the contention of the city that the property is located in a thickly settled residential area, isolated from the business district; that a great many of the commodities sold by retail grocery stores are very injurious to children, and that the ordinance really is for the protection of children; that it will detract from the beauty of the residences in the neighborhood; that it will tend to depreciate the value of these residences; that the increase of traffic in front of the store will be a nuisance; that the assembling there of persons will tend to destroy the privacy of these residences; that there will be nuisances caused thereby; that debris will probably accumulate around the store; that unpleasant odors are apt to emanate therefrom. The court is asked to take judicial notice of these facts.

The bill alleges that the store will be a brick store, properly erected, and that the business of a retail grocery will be properly and lawfully conducted.

While a grocery store is most probably undesirable for the neighboring residents, as stated by the appellee, it is also probably true, as also stated by the appellee, that it might be very attractive for the children. An overindulgence in sugars and candies and soda water is quite likely injurious to children, but it is perhaps the primary duty of the parents to prevent these children from these overindulgences. It is not contended, of course, and cannot be, that the proper operation of the business, a mercantile business, a dry goods store, or a retail grocery store, is a nuisance *per se.* If properly and lawfully operated, it will not become a nuisance. If unlawfully operated such as to become a nuisance, there is a legal way for it to be suppressed or abated.

The appellant contends that the ordinance deprives him of a lawful use of a property without just compensation, does not come within the police power, and is void. We are indebted to counsel on both sides for excellent briefs

and a wealth of authorities. It would protract this opinion to undue length to discuss all of the authorities cited. Referring to them generally, we might say that, while there are authorities from other states which would sustain the validity of this ordinance, we think the weight of authority and the better reasoned cases are to the effect that such a sweeping ordinance as the one here is not a valid exercise of the police power of the municipality, and in this case, in view of the previous decisions of this court, we are constrained to hold that the ordinance does not come within the police power of the city of Jackson. We are therefore of the opinion that it is in violation of our state Constitution. It is unnecessary therefore to consider whether or not it is violative of the Constitution of the United States, and therefore the decisions with reference to the latter Constitution will not be here considered by us.

In the case of *Town of Clinton* v. *Turner*, 95 Miss. 594, 52 So. 261, the court correctly stated that:

"Municipalities act under limited powers, and must find authority clearly given in the law, and, when so found, they must follow the law."

The exercise of the police power, when that power is given, is most delicate and far reaching. The right of the citizen to be protected in his life, liberty, and the lawful use of his property is one of the most sacred rights reserved to him under our Constitution.

Section 17 of this Constitution prohibits the taking or damaging of private property for public use except on due compensation.

By section 5826, Hemingway's Code (section 3329, Code of 1906), a municipality is given the power:

"To make all needful police regulations necessary for the preservation of good order and the peace of the municipality; and to prevent injury to, destruction of, or interference with public or private property; and to adopt ordinances prohibiting within the corporate limits the com-

mission of any act which amounts to a misdemeanor under the laws of the state."

Section 5839, Hemingway's Code (section 3342, Code of 1906), authorizes the city to prohibit and suppress dram shops and other disreputable places, naming certain ones, and winding up as follows:

"And all kinds of indecency and other disorderly practices, disturbance of the peace, and to provide for the punishment of the persons engaged therein."

Section 5895, Hemingway's Code, authorizes municipalities to establish fire districts.

From these statutes it will be seen that the police power relied on by the city will be found in section 5826, Hemingway's Code (section 3329, Code of 1906), under the power to make all needful police regulations necessary for the preservation of good order and the peace of the municipality. This case might be disposed of by stating that it is not necessary for the preservation of good order or the peace of the municipality to enact such an ordinance. Rather that this order can in no way be ascribed to the preservation of peace and good order of a municipality.

Conceding, however, that the municipality within its limits may exercise the police powers vested in the state, is this ordinance a valid exercise of such power? In this connection the decision of the court in the case of *Quintini* v. *City of Bay St. Louis,* 64 Miss. 483, 1 So. 625, 60 Am. Rep. 62, *supra,* is illuminating. An act of the legislature gave the city of Bay St. Louis power—"to declare what shall constitute a nuisance in said city, and to prohibit, prevent, and abate the same, and in connection with all matters or things that are or may be hereafter declared as aforesaid to be a nuisance shall be included all shanties and other buildings now erected or may hereafter attempted to be erected on the beach side of the front street of said city when the same has a tendency to depreciate in value the property of persons nearby, or in any manner obstruct the view of the same, or the breeze therefrom,

the same being essential to the comfort, convenience, and good health of the occupants thereof; and any act done, or structure or thing erected or suffered, after it has been declared by said board of mayor and aldermen to be a nuisance, is hereby declared to be a nuisance, and shall be so held and considered by all the courts of this state as fully as if such act, thing, or structure were herein expressly named and prohibited."

Quintini's lot was within the forbidden ground. A market house had existed on the lot for more than forty years. This house was torn down and Quintini was preparing to build a larger building, when forbidden to do so. The question there presented was whether or not the legislature could declare, or authorize the municipal authorities to declare, private residences to be nuisances, because they had a tendency to depreciate the value of property of persons nearby or obstruct the view of the breeze. In the opinion the court said:

"By one legislative decree this private property along the whole of one side of the principal street is swept out of beneficial existence because the use of it for any of the ordinary purposes of life has a tendency to depreciate that upon the other side by obstructing the view of the bay, or by intercepting the breezes which blow from the Mexican Gulf. There is scarcely, either in the answer or the evidence, a suggestion that the object of the ordinance and legislative declaration is other than to enhance the beauty of the street. The suggestion that the health of the town will be impaired by the obstructing of the health-giving breezes raises the pertinent inquiry, why they will not be equally obstructed by the residences on the other side of the street, and the fact that the view will be obstructed suggests the further question whether a view can be taken from one man because it can be enjoyed only from the rear of his house and conferred upon another, whose only superior equity is that it is unfolded in his front. The law can know no distinction between citizens because of the superior cultivation of the one over the other. It is with

common humanity that legislatures and courts must deal, and that use of property which in all common sense and reason is not a nuisance to the average man cannot be prohibited because repugnant to some sentiment of a particular class. That the legislature, in the exercise of the police power, may prohibit in particular localities such use of property as is injurious to public health is admitted, and what it may do may also be authorized to be done by the local authorities, but it does not follow that it may, by a mere declaration, convert the harmless, proper, and ordinary use of property into a nuisance. Where the use of the land furnishes the test for the determination of the constitutionality of the law, the legislature may not conclusively determine the effect to be harmful. This would be the assumption of judicial functions by the legislative department, and if yielded to by the courts would be an abrogation of those duties and powers committed by the Constitution to the judicial department, and the untrammeled exercise of which is essential for the preservation of life, liberty, and property."

The proper operation of a grocery store cannot possibly be injurious to the public health. One of the ordinary uses of property is for personal gain, and in the lawful use of this property the individual is protected by the Constitution. He must so use it as not to injure others. By using this property for the purpose of conducting a retail grocery store in a lawful manner he does not injure, in the legal sense, the property of his neighbor.

There is no exact definition of the term "police power." The courts have carefully refrained from attempting such definition. The supreme court of the United States has held that the police power of the state embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals, or the public safety. *Railroad Co.* v. *Illinois,* 200 U. S. 561, 26 Sup. Ct. 341, 50 L. Ed. 594, 4 Ann. Cas. 1175. This is perhaps one of the most liberal interpretations of the police

powers of the state to be found in the judicial decisions. We doubt, but do not here decide, that under our Constitution the state under the police power has the right to pass regulations purely to promote the public convenience or the general prosperity to the disadvantage and detriment of the individual property holders. In this case, however, we do not think that even under this sweeping inclusion this ordinance could be said to promote the public convenience or the general prosperity of the municipality or its inhabitants.

One of the leading cases and a case greatly relied upon by the appellee is that of the *Opinion of the Justices to the House of Representatives,* 234 Mass. 598, 127 N. E. 525. The Constitution of the state of Massachusetts was amended whereby the general court was given power "to limit buildings according to their use or construction, to specify districts of cities and towns." Const. Amend., art. 60. A zoning ordinance was passed in pursuance of this constitutional authority, and the court held that it neither violated the Constitution of Massachusetts or that of the United States.

We have no such constitutional enactment in Mississippi, and while this decision is a learned one and discusses in detail the authorities bearing on the question of the legality of these ordinances, it rests upon the fact that this amendment authorizes the law. What the court would have held in the absence of this amendment cannot be said. It also held it was not violative of the federal Constitution, which question we are not considering.

This ordinance makes no classification of businesses because of their nature or the necessary incidents of such business. It simply says no business can be conducted in the residential portions of the town except under the circumstances therein named. We therefore carefully refrain from stating what businesses might be included within the police power. Numbers of states have legislative enactments on municipal ordinances directed to classi-

fications of some businesses which may be injurious to health, dangerous or hazardous, or of some such character.

One of the best-considered cases dealing with this question is that of *Spann* v. *City of Dallas*, 111 Tex. 350, 235 S. W. 513, 19 A. L. R. 1387, and quoting therefrom:

"Property in a thing consists not merely in its ownership and possession, but in the unrestricted right of use, enjoyment, and disposal. Anything which destroys any of these elements of property to that extent destroys the property itself. The substantial value of property lies in its use. If the right of use be denied, the value of the property is annihilated and ownership is rendered a barren right. Therefore a law which forbids the use of a certain kind of property strips it of an essential attribute and in actual result prescribes its ownership.

"The police power is a grant of authority from the people to their governmental agents for the protection of the health, the safety, the comfort, and the welfare of the public. In its nature it is broad and comprehensive. It is a necessary and salutary power; since without it society would be at the mercy of individual interests, and there would exist neither public order nor security. While this is true, it is only a power. It is not a right. The powers of government, under our system, are nowhere absolute. They are but grants of authority from the people, and are limited to their true purposes. The fundamental rights of the people are inherent and have not been yielded to governmental control. They are not the subjects of governmental authority. They are the subjects of individual authority. Constitutional powers can never transcend constitutional rights. The police power is subject to the limitations imposed by the Constitution upon every power of government; and it will not be suffered to invade or impair the fundamental liberties of the citizen, those natural rights which are the chief concern of the Constitution and for whose protection it was ordained by the people. All grants of power are to be interpreted in the

light of the maxims of Magna Charta and the common law as transmuted into the Bill of Rights; and those things which those maxims forbid cannot be regarded as within any grant of authority made by the people to their agents. Cooley, Const. Lim. 209. . . .

"It is not a right, therefore, over which the police power is paramount. Like every other fundamental liberty, it is a right to which the police power is subordinate.

"It is a right which takes into account the equal rights of others; for it is qualified by the obligation that the use of the property shall not be to the prejudice of others. But if, subject alone to that qualification, the citizen is not free to use his lands and his goods as he chooses, it is difficult to perceive wherein his right of property has any existence. . . .

"Since the right of the citizen to use his property as he chooses, so long as he harms nobody, is an inherent and constitutional right, the police power cannot be invoked for the abridgment of a particular use of private property, unless such use reasonably endangers or threatens the public health, the public safety, the public comfort or welfare. A law which assumes to be a police regulation, but deprives the citizen of the use of his property under the pretense of preserving the public health, safety, comfort, or welfare, when it is manifest that such is not the real object and purpose of the regulation, will be set aside as a clear and direct invasion of the right of property without any compensating advantages. Cooley, Const. Lim. 248."

An exhaustive note is found to this case.

This ordinance is an arbitrary interference with the individual use of private property by the owner thereof. It does not come within the police power delegated to the municipality nor the police power of the state. As the case is really here presented on the merits, the decree of the lower court will be reversed, and decree entered here in favor of appellant in accordance with the prayer of the bill.

*Reversed and decree here.*