DANIEL GOLDMAN *vs.* J. FRANK CROWTHER, INSPECTOR OF BUILDINGS FOR BALTIMORE CITY, ET AL.

*Zoning Ordinance—Validity—Constitutional Guaranties— Police Power.*

In determining the validity of a zoning ordinance, the courts cannot be controlled by its possible benefit to the public, if in point of fact that benefit is purchased by appropriating the rights and property of individuals to the public use without just compensation, and by the violation of the guaranties of the State and federal constitutions.                     p. 287

Wherever the police power is invoked in aid of any purpose or legislation, such purpose or legislation must bear some defi-

nite and tangible relation to the health, comfort, morals, welfare, or safety of the public.        p. 293

That a statute has been enacted for the ostensible purpose of guarding the safety, health, comfort, or promoting the general welfare, does not necessitate its acceptance as a proper exercise of the police power, nor can a statute which is a proper exercise of that power be declared void merely because it results in circumscribing limits of individual conduct to narrower bounds.
p. 293

Any exercise of the police power which interferes with some right protected by the letter of the Constitution must bear some substantial relation to the public health, morals, safety, comfort, or welfare, since, while the existence of the police power may be invoked to determine what rights are guaranteed by the Constitution, it can never be invoked to justify an invasion of those rights once they have been ascertained.        p. 295

While every one holds his property subject to the implied condition that his use of it shall not injure others with equal rights, so long as his use of it does not interfere with or injuriously affect the public health, morals or safety, he will be protected in his use and ownership of it against the state or any agency or department thereof.        p. 296

The right to hold, enjoy, and use property is not absolute, but is subject to the police power of the state, and that power may be affected by changing conditions.        p. 302

Property in a populous urban community may be properly subjected to restrictions which would be unreasonable and arbitrary in a thinly settled rural community, so long as the restrictions bear some definite relation to the protection of the public health, morals, safety, or comfort.        p. 302

The power to hold, use, and enjoy property cannot be restricted or taken away by the state, without compensation, under the guise of the police power, for purely æsthetic reasons, or for any such elastic and indeterminate object as the general prosperity.        pp. 302-308

So much of the Baltimore City zoning ordinance as attempts to regulate and restrict the use of property is invalid as depriving property owners of constitutional rights and privileges, without justification by any consideration for the public wel-

fare, security, health, or morals apparent in the ordinance itself, and without any requirement that the restrictions be in fact based upon any such consideration.          p. 309

The only apparent purpose of the restrictions in the ordinance, upon the use of property in the residence zones, being to prevent the encroachment of business establishments, regardless of whether they affect in any way the public health, morals, safety, or welfare, in effecting that purpose they take from the property owner the right to use his property for any purpose not sanctioned by the letter of the ordinance or allowed by the practically unfettered discretion of the board of zoning appeals, and deprive him of privileges guaranteed by the twenty-third article of the Maryland Bill of Rights.          p. 309

The zoning ordinance of Baltimore City, in providing for an appeal from the board of zoning appeals to the Baltimore City Court, does not improperly extend the jurisdiction of that court, since Const., art. 11A, provides that the mayor and city council shall have full power to enact local laws, and they have consequently the same power as the General Assembly to provide for such judicial hearings as may be deemed proper and necessary to the administration of such laws.          p. 310

The zoning ordinance is not objectionable because it delegates a discretion to the board of zoning appeals, but such delegation is objectionable because there is a failure to provide any proper standards or rules by which the exercise of that discretion must be guided and limited in so far as it applies to the "use" provisions of the ordinance.          p. 311

That the standards and rules provided in the ordinance to control the exercise of the discretion vested in the board of zoning appeals in passing upon the uses of property are too indefinite does not show that they are insufficient to limit that discretion when applied to the location and construction of buildings.          p. 311

*Decided February 3rd, 1925.*

Appeal from the Superior Court of Baltimore City (HEUISLER, J.).

Mandamus proceeding by Daniel Goldman against J. Frank Crowther, Inspector of Buildings for Baltimore City, and Howard Jackson, Mayor, to which proceeding B. Howard Haman was, on his petition, made an additional party defendant. From an order refusing to issue a mandamus as prayed, petitioner appeals. Reversed.

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*Joseph C. France, Isaac Lobe Straus* and *James E. Tippett,* with whom were *Charles McHenry Howard* and *Lloyd L. Jackson, Jr.,* on the brief, for the appellant.

*Philip B. Perlman, City Solicitor, Wirt A. Duvall, Jr., Deputy City Solicitor,* and *George E. Kieffner, Assistant City Solicitor,* for J. Frank Crowther, Inspector of Buildings, and Howard W. Jackson, Mayor, appellees.

*George Ross Veazey,* for B. Howard Haman, appellee.

*Charles F. Stein, Jr.,* and *Skinner, Hermann & Skinner* filed briefs by leave of court.

OFFUTT, J., delivered the opinion of the Court.

Daniel Goldman and his wife, as tenants by the entireties, own the property known as 1513 Park Avenue in a part of Baltimore City which, under Ordinance No. 922 of the Mayor and City Council of Baltimore City, known as the "zoning ordinance," is classified as a residence district. In May, 1923, Goldman undertook to use the basement of a four story dwelling on that property for repairing, by hand and an ordinary sewing machine, for hire, used clothing for such patrons as had occasion to require his services. The business which he thus carried on required no alteration or repair of the building, and in the opinion of Goldman no permit was necessary to use it for that purpose. He was however informed that by so using it without a permit he was violating certain ordinances of the Mayor and City Council of Balti-

more and shortly thereafter he was arrested for such viola-
tion, and while that complaint against him was pending he
applied to the inspector of buildings of Baltimore City for a
permit to use the premises for the purposes referred to. The
inspector of buildings refused to grant the permit, partly at
least on the ground that he was compelled under the zoning
law to disapprove applications for such a use of property in
a residence district. Goldman then filed in the Superior
Court of Baltimore City a petition in which he asked that
a writ of mandamus be issued against the building inspector
of Baltimore City and the mayor of said city, directing them
to issue to him a permit for the use of his premises for the
purposes referred to above. The defendants answered that
petition, and in their answer they averred that the permit
was refused not only upon the authority of the zoning ordi-
nance, but as well upon the authority of other ordinances of
the City of Baltimore vesting a discretion in the building
inspector as to the issuance of permits in such cases, and
that in refusing the permit in this case the building inspector
acted in the exercise of that discretion. In connection with
such issues of fact as were presented by the petition and the
answer thereto, an agreed statement of facts was filed, and
from that statement and the admissions found in the plead-
ings it further appears that the real and substantial reason
for refusing the permit was that Goldman's property is
located in a residence district of Baltimore City, the outlines
of which are fixed by the zoning ordinance referred to. The
verdict of the trial court was in favor of the defendants and
the writ of mandamus refused, and from the judgment on
that verdict this appeal was taken.

The important and controlling, and indeed under the
agreed statement of fact the only question presented by the
appeal is whether the zoning ordinance of Baltimore City,
known as Ordinance No. 922, in so far as it affects the right
of the appellant to use his property in the manner we have
described, is a valid and an enforceable enactment, and in
dealing with that question it can be said that there is nothing

in the record from which it can be inferred that such use is offensive to the eye, the ear, or the nose of a person of ordinary sensibilities, or that it imperils the public health, welfare or safety, any more than would the same character of work if done by Goldman for himself and his family, except that possibly more of it is done.

This question can be approached by either of two avenues; one legal; the other political and sociological. If approached by the former the validity of the restraints and prohibitions of the ordinance must depend upon whether they violate certain definite guaranties and assurances found in the Federal and State constitutions and the law of the land. If approached by the latter, the question is to an extent freed from the embarrassment of harmonizing any apparently repugnant provisions of the act with those guaranties, since in such case the end to be accomplished and the benefit to be derived are the main factors to be considered, and the rights of mere individuals may be subordinated to the public convenience, upon the principle that such rights are always subject to the paramount authority of the State to subordinate them to what is conceived by those speaking for it to be for the benefit of the State, as representing all the citizens.

Which one of these two methods of approach should be used in this case is a question which goes to the root of our system of government, but without referring further to that, it is sufficient to say that in our opinion we are not at liberty to examine the question from any other than a legal standpoint, and therefore we cannot be controlled in our consideration of the validity of this ordinance by its possible benefit to the public, if in point of fact that benefit is purchased by appropriating the rights and property of individuals to the public use without just compensation, and by the violation of the guaranties of the State and Federal Constitutions.

We will now examine the statute itself to ascertain just what it is and what it does.

It first divides the City of Baltimore into various districts, classified according to the use to which property may be

put, the height of buildings which may be erected and the proportion of the whole area which buildings may occupy on lots on which they may be placed.

The outlines of these several districts are fixed by certain maps accompanying the ordinance as a part of it. By these maps the entire city is divided first as to use into (a) residence districts, (b) first commercial districts, (c) second commercal districts, (d) industrial districts; and in those districts it is provided that "no building shall be erected or used and no land shall be used for any purpose other than a purpose permitted in the 'use' district in which such building or land is located."

In a residence district no building or land shall be used and no building shall be erected which is arranged, intended or designed to be used except for one or more of these specified uses:

(1) Dwellings; (2) Lodging or boarding houses; dormitories or convents; (3) Hotels, which have more than twenty sleeping rooms; (4) Clubs, except clubs the chief activity of which is a service customarily carried on as a business; (5) Churches; (6) Libraries or public museums; (7) Municipal recreation uses; (8) Railroad rights of way; (9) Farming, gardening, nurseries or green houses; (10) Apartment garages, without repair facilities or gasoline filling stations, each apartment of which shall not have over two private motor cars, etc.

In the first commercial districts no land or building shall be used and no building shall be erected for certain specified trades.

No building or land shall be used and no building erected in the second commercial districts for any one of eighty-seven specified trades, industries or uses, and no building or land shall be used or erected for any trade, industry or use that is noxious or offensive, but it permits street car barns, trouble stations, bus garages, electric sub-stations, gas holder stations, public utility distribution shops, telephone exchanges, or places of amusement.

The ordinance further provides that any building or land may be used in industrial districts for any purpose not prohibited within the city limits.

It also contains a general provision authorizing the board of zoning appeals, in appropriate cases, to determine and vary the application of the use district regulations herein established in harmony with their general purpose and intent, and then sets out and limits the extent of the authority thus given the board of zoning appeals to vary the terms of the ordinance, but authorizes it to permit in any use district: 1. Amusement parks. 2. Aviation fields. 3. Crematories. 4. Public utility plants. 5. Refuse dumps. 6. Sewage disposal plants.

Second. As to height the city is divided into five height districts, in which the height of buildings erected is required to conform to certain ratios varying as to the several districts from two and a half times the width of the street on which they front to forty feet in height.

Third. As to area, the city is divided into six area districts, in which no building may be erected which occupies more than a certain percentage, varying as to each district, of the lot on which it is located, and in which the number of families who may dwell on a given area is fixed.

The inspector of buildings of Baltimore City, called the zoning commissioner, is charged with the duty of enforcing the ordinance, and a board of zoning appeals is established and authorized to hear and decide appeals from any order, requirement or decision of the zoning commission in carrying out the ordinances, and there may be an appeal from any order, requirement, &c., of said board of zoning appeals to the Baltimore City Court, which is required to hear the case represented by the appeal *de novo* and authorized to pass such order in the premises as it may deem right and proper. It also provides that: "Upon the hearing, any party may appear in person or by agent or by attorney. The board of zoning appeals may reverse or affirm, wholly or partly, or may modify the order, requirement, decision or determina-

tion appealed from, and shall make such order, requirement, decision or determination as in its opinion ought to be made in the premises, and to that end shall have all the powers of the zoning commissioner in accordance with this ordinance. Where there are practical difficulties or unnecessary hardship in the way of carrying out the strict letter of this ordinance and the maps which are a part hereof, the board of zoning appeals shall, with the concurring vote of five members, have the power in passing upon appeals, to vary or modify any of the regulations or provisions of this ordinance, relating to the use, construction or alteration of buildings or structures or the use of land, so that the spirit of the ordinance shall be observed, public safety and welfare secured and substantial justice done. The rule that the board of zoning appeals shall follow in deciding the various questions referred to in this ordinance, shall be the protection of living conditions as far as reasonable or the prevention of serious injury to the appropriate use of neighboring property."

By this ordinance all the land in the City of Baltimore is subjected to restrictions which limit the number of families who may dwell on it, the use to which it may be put, the height of buildings which may be constructed on it, and the proportion of each lot of ground which a building may occupy, except that in the "industrial use district" the land or structures thereon may be used for any lawful purpose. Many of these restrictions relating to the use of property bear no apparent relation to the public health, safety or welfare, nor does the ordinance contain any definite or fixed standards by which the reasonableness or the necessity for the restrictions may be measured or determined, nor are they necessarily uniform or definite in their application. For after specifying with the most meticulous particularity the nature, extent and application of the restrictions, the board of zoning appeals is authorized in its discretion to disregard the "strict letter" of the ordinance, and to vary or modify any of the regulations or provisions contained in it relating to "the use, construction or alteration of buildings or structures or the use of land, so that the spirit of the ordinance

shall be observed, public safety and welfare secured and substantial justice done." This sonorous but vague and cloudy formula is to say the least of it a poor and uncertain substitute for those guaranties of the State and Federal Constitutions which assure to every citizen the right to hold and enjoy and use his property in any manner he pleases so long as he does not thereby injuriously affect the health, security or welfare of his neighbor or the public, as the words health, security and welfare have hitherto been understood in this State. There may also be an appeal from the board of zoning appeals to the Baltimore City Court, but that remedy, if anything, increases rather than lessens the difficulty and hardship which the ordinance inflicts upon the landowner, for it only transfers the discretion from the board of zoning appeals, which would presumably have some special knowledge and training, to a jury which might have none and who, in the absence of any fixed or definite rules or standards to guide them, would naturally exercise that discretion varyingly in accordance with the views of different juries.

Before dealing with the constitutionality of the ordinance in whole or in part, we will refer briefly to the territory upon which it is to operate.

From a small village containing a few scattered houses on the shores of the Patapsco in 1729, Baltimore City has grown into a great maritime city, with a population currently estimated in round numbers at eight hundred thousand, occupying over eighty square miles. Within its confines are found an infinite variety of commercial and industrial enterprises and activities. Its commerce is borne over the world by great land and water transportation systems which serve its people. It includes within its boundaries property devoted to every variety of use, including residential, commercial, agricultural, industrial, maritime and recreational. It is constantly expanding and constantly with its growth and changing conditions the use of property in it changes, so that what was formerly residential property has become commercial property, and property which was at one time most useful for commercial or agricultural purposes is

now most valuable for industrial purposes. Heretofore these changes have been in response to conditions created by the growth of the city, the increase of its population, the demands of new enterprises, changes in transportation facilities, changing markets, and various other factors which cannot be readily anticipated or controlled. This ordinance at a stroke arrests that process of natural evolution and growth, and substitutes for it an artificial and arbitrary plan of segregation, under which the landowner may only use his property for certain designated purposes, and under which he may be forbidden to use it for the only purpose for which it is adapted and most valuable.

The appellant contends that in doing that the ordinance appropriates private property to a public use without compensation to the owner; that it takes the property of the citizen without due process of law; and that it denies to the citizen and landowner of Baltimore City the equal protection of the law. It is also contended that it improperly delegates legislative and judicial powers to a municipal administrative agency, and that it illegally extends the jurisdiction of the Baltimore City Court.

In dealing with the questions raised by these objections, in so far as they involve a construction of the Constitution of this State, we are bound by the decisions of this Court construing and giving effect to the provisions of that instrument, relating to and affecting the consideration of these questions.

Whether the ordinance is valid or not depends mainly upon whether there is any limit to the police power of the State, and whether any rights of the appellant, which are not within those limits but which are within the protection of the Constitution, Federal or State, are violated by it.

While it is difficult if not impossible to define precisely the limits of the police power, there must in the very nature of things be some limit to it, for otherwise the guaranties of written constitutions would be little more than mere precatory and directory suggestions without force or life, affording to the citizen only a false and illusory protection against the invasion of his rights by the State, and his

security would depend not upon constitutional guaranties but upon the will of the State in exercising an unlimited police power.

In this State the courts have uniformly held that the police power is not unlimited, but that wherever it is invoked in aid of any purpose or legislation, such purpose or legislation must bear some definite and tangible relation to the health, comfort, morals, welfare, or safety of the public which must define the farthest boundaries of its territory.

While loose and indefinite expressions may no doubt be found in the books which appear to justify the contention that there is no definite limit to the police power, that contention has not been recognized in this Court, but what we conceive to be the correct rule has been stated in *Byrne v. Md. Realty Company,* 129 Md. 210, where it was said: "It does not follow that because a statute has been enacted for the ostensible purpose of guarding the safety, health, comfort or promoting the general welfare, it must be accepted as a proper exercise of the police power of the State; nor can a statute which is, in fact, a proper exercise of such power, be declared void merely because it results in circumscribing limits of individual conduct to narrower bounds. Necessarily there are limits beyond which legislation cannot constitutionally go in depriving individuals of their natural rights and liberties. To determine where the rights of the individual end, and those of the public begin, is a question which must be determined by the courts. The Constitution is the highest written law of the State. The courts must obey both the Constitution and the statutes, but in case of conflict between the two, the Constitution must control, and the statute must give way. When there has been an attempt to exercise the police power of the State by the law-making department of the government, and the validity of such act is challenged as being an unreasonable invasion of private rights, the courts must, upon their own responsibility, determine whether in the particular case the constitutional limits have been passed." Other jurisdictions have gone farther than that, and perhaps the broadest and most sweeping defini-

tion of the power is to be found in *C. B. & Q. R. R. v. Illinois,* 200 U. S. 592, where it is said: "We hold that the police power of a state embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals, or the public safety. * * * Private property cannot be taken without compensation for public use under a police regulation relating strictly to the public health, the public morals, or the public safety, any more than under a police regulation having no relation to such matters, but only to the general welfare." But in referring to the police power as thus defined, the same court, in *Eubank v. City of Richmond,* 226 U. S. 142, said: "But necessarily it has its limits and must stop when it encounters the prohibitions of the Constitution. A clash will not, however, be lightly inferred. Governmental power must be flexible and adaptive. Exigencies arise, or even conditions less peremptory, which may call for or suggest legislation, and it may be a struggle in judgment to decide whether it must yield to the higher considerations expressed and determined by the provisions of the Constitution." By the first case the limits of the police power are extended to cover everything which the courts or the legislature may determine to be in furtherance of the public convenience or general prosperity, but by the second case it is held that the power as thus defined has its limits and must stop when it reaches the prohibitions of the Constitution, and the rule as established by the two cases does not differ substantially or in effect from that stated in *Byrne v. Md. Realty Co., supra.* If it had any broader meaning, in so far as the guaranties of the State Constitution are involved, we would be inclined to accept the statement of the court in *Fitzhugh v. Jackson,* 132 Miss. 585: "We doubt, but we do not here decide, that under our Constitution the state under the police power has the right to pass regulations purely to promote the public convenience or the general prosperity, to the disadvantage and detriment of the individual property holders," but in the view we take of the question it is unnecessary to decide that point.

There is a theory which has obtained some recognition, that the guaranties of written constitutions are not inflexible, and that the decisions construing them at one period of the state's history, under conditions existing then, ought not to bind the courts at some later period when conditions have changed, and when from economic, sociological or political considerations it is desirable that a different or more liberal construction be given. That theory is based upon the conception that any constitutional guaranty, no matter how plain and clear it may be, can be dissolved and avoided by the application of the police power of the state. That the police power is a real and essential element in the sovereignty of the state cannot be questioned or denied, and that written constitutions are presumed to have been made with conscious knowledge of that fact must be admitted. But it has never been supposed in this State that the police power is a universal solvent by which all constitutional guaranties and limitations can be loosed and set aside regardless of their clear and plain meaning, nor that it is a substitute for those guaranties, for far-reaching and powerful as it is, it has its limitations. Just what those limits are have not been, and in the nature of things, cannot be clearly and definitely marked, except that any exercise of the power which interferes with some right protected by the letter of the Constitution must bear some substantial relation to the public health, morals, safety, comfort or welfare For while the existence of the police power may be invoked to determine what rights are guaranteed by the Constitution, it can never be invoked to justify an invasion of those rights once they have been ascertained.

And if in fact this ordinance does appropriate private property to a public use, or if it does deprive owners of their property without compensation, then such an invasion of private rights cannot be sustained under the police power unless the exercise of those rights menaces the public health, safety or morals.

The danger inherent in any departure from these prin-

ciples is forcibly and clearly pointed out by Mr. Justice Holmes in *Penn. Coal Co. v. Mahon,* 260 *U. S.* 415, where speaking for the Court he said:

"The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. *Hairston v. Danville & W. R. Co.* 208 U. S. 598, 605. When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.

"The general rule, at least, is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. * * * We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

And while every one holds his property subject to the implied condition that his use of it shall not injure others with equal rights, so long as his use of it does not interfere with or injuriously affect the public health, morals or safety, he will be protected in his use and ownership of it against the state or any agency or department thereof.

Private use and ownership of property has always been regarded by the courts of this State as one of the most valuable privileges guaranteed by its Constitution, as one of the most durable and solid foundations of its government, and as indispensably necessary to the prosperity and welfare of the people, and the substitution of communal or state ownership for that system has not heretofore been regarded as within the powers of the courts or the legislature.

In dealing with the validity of the ordinance before us, therefore, we will start with the premise, that if its purpose

and provisions can only be justified by invoking the police power of the state, that they must bear some substantial cognizable relation to the public health, the public security, the public morals, the public welfare, or the public comfort.

Within the last few years a veritable flood of so-called "zoning" legislation has swept over the country, and in its wake there has been litigation. In the many decisions of state and federal courts dealing with that litigation, there has been some conflict and some confusion, but since the principles by which we must be controlled in passing on the validity of this statute have been repeatedly considered and stated by this Court, we are not concerned in harmonizing those cases, for no matter what the law may be elsewhere, this Court could not be justified upon any ground of expediency in departing from its construction of such fundamental and important constitutional provisions as those involved in this case, when they have been established by its uniform and unbroken action since those provisions have been a part of the organic law of this State. Any other course would necessarily result in chaos, and would tend to substitute for the government of law under which we now live a government under which the rights of citizens would depend, not upon the plain terms of written constitutions, but upon the judgment and opinions of legislative majorities and the officials composing the many boards, commissions and other agencies clothed with executive, judicial, administrative and legislative powers, through which so large a part of our government is carried on.

Before dealing with the provisions of this particular ordinance, we will review briefly some of the decisions of this Court bearing upon the questions which the attack upon its validity presents.

In *Moale v. Baltimore,* 5 Md. 314, the particular question before the Court was whether a provision of chapter 148 of the Acts of 1817, that no person "shall be entitled to damages for any improvement unless the same shall have been made or erected before the laying out of such street" was con-

stitutional. The act referred to provided for the opening of East Biddle Street in the City of Baltimore. In dealing with the validity of that proviso this Court said: "While it is clear that the sovereign power has the right * * * to appropriate private property to public uses, yet it cannot do the latter without making just compensation for it. The sacredness of the rights of property is everywhere recognized by the spirit of the common law, Magna Charta and our Bill of Rights. * * * We hold, therefore, that it was not competent to the legislature to confiscate the property of the citizen, and we regard the provision of the act of 1817, which denies to the proprietor the use of his land, as nothing short of an act of confiscation."

In *Commissioners of Easton v. Covey,* 74 Md. 262, it appeared that the commissioners of the town of Easton had passed an ordinance regulating the erection of new buildings within the corporate limits by forbidding the erection of such buildings without the obtention of a permit from the commissioners of the town. The Court sustained that ordinance upon the ground that it was not only useful but essential to the welfare and prosperity of the town that the erection of buildings therein should be regulated.

In *Bostock v. Sams,* 95 Md. 400, the validity of an ordinance of Baltimore City, providing that no new buildings should be erected in that city without a permit and that no such permit should be granted unless in the judgment of the judges of the appeal tax court or a majority of them, the size, the general character, and appearance of the building to be erected should conform to the general character of the buildings previously erected in the same locality, and should not in any way tend to depreciate the value of the surrounding improved or unimproved property, was questioned on the ground that it deprived persons affected of their property without due process of law and that it improperly delegated to the appeal tax court the authority to refuse such permits. The Court in dealing with that contention in that case said: "Now undoubtedly the proviso in the ordinance here under

consideration attempts to confer powers that affect the citizen in his right of property and his common law right. It cannot be pretended that the citizen has not the common law right to acquire title to a lot of land, qualified or absolute, in a city as elsewhere and to build upon, and improve it as his taste, his convenience or his interest may suggest or as his means may justify without taking into consideration whether his buildings and improvements will conform in 'size, general character and appearance' to the 'general character of the buildings previously erected in the same locality'; even though there might be those in whose 'judgment' his so building might in some way 'tend to depreciate the value of surrounding improved or unimproved property.'" In the same case it was further said in reference to that proviso: "The proviso under consideration has no reference to any of the objects specified or provided for in the authority given the corporation to make regulations as to buildings. It contains no suggestion that it was intended to provide for the public safety; nor to safeguard the health or morals of the community; nor to preserve public order; nor in any way to be promotive of any object which calls for the exercise of the police power."

In *State v. Hyman,* 98 Md. 596, in passing upon the validity of an act of the Legislature which required that no room or apartment in any tenement or dwelling house should be used for the manufacture of coats, vests, trousers, etc., without a permit from the chief of the bureau of industrial statistics, this Court held that that ordinance had a definite and substantial relation to the police power because it concerned the public health and welfare.

In *Hagerstown v. Balto. & Ohio R. Co.,* 107 Md. 178, the question before the Court was whether an ordinance of the municipality of Hagerstown making it unlawful for any person without first obtaining a permit therefor to herd cattle or other domestic animals in the city limits within 250 feet of two or more residences unless they were kept in enclosed and covered structures, with only such openings as were necessary for ventilation and access, was valid. It was held

in that case that the ordinance was void because it placed unreasonable, arbitrary and oppressive power in the hands of the Mayor and City Council of Hagerstown, and the Court in so holding cited *Mayor &c. v. Radecke,* 49 Md. 230, in support of the principle "that where an ordinance laid down no rules by which its impartial execution could be secured, or partiality and oppression prevented, it would be declared invalid."

In *Cochran v. Preston,* 108 Md. 220, an ordinance forbidding the erection of buildings exceeding a certain height above the surface of the street in the vicinity of the Washington Monument, the Peabody library and art gallery, and several statues, was held to be a valid exercise of the police power because its purpose was to protect "the handsome buildings and their contents located in that vicinity, and also the works of art clustered there, from the ravages of fire."

In *Brown v. Stubbs,* 128 Md. 129, an ordinance requiring that the assent of the mayor and city council should be obtained before the building inspector could grant an application for a permit to erect any building or structure for exhibiting moving picture shows, &c., was a valid exercise of the police power, because it involved the protection of life and property from damage or destruction through fire and panic.

In *Stubbs v. Scott,* 127 Md. 86, there was an application made to the inspector of buildings of Baltimore City for a permit to erect a building on a lot described in the proceedings and which was to be used as an automobile sales room and service station. The application was refused on the ground that in the opinion of the mayor and the inspector of buildings no permit should be granted for a store building in that neighborhood and a permit was refused. In reviewing that action this Court said: "But in our judgment that was not sufficient to justify his refusal to grant the permit under the evidence in the record." And the Court further said: "It cannot be denied that less pretentious buildings than those already in a particular neighborhood may be and often are objectionable, not only to the owners of those there, but to

other residents of the city, but if they comply with building regulations having reference to protection against fire and other things which can be validly regulated, we know of no way of preventing their erection, unless possibly it be under some very peculiar circumstances, different from those in this case," and in the same connection it said: "Opening stores in some neighborhoods may be injurious to surrounding properties occupied for residences, but it would be difficult, if not impossible, to prevent an owner from converting his residence into a store building, even in the most exclusive part of the city, if he saw proper to do so. * * * But it would be going very far to say that the owner of this lot could not erect stores on it, simply because there are now no stores there, and there are valuable properties of other kinds in the immediate neighborhood."

In *State v. Gurry*, 121 Md. 534, in dealing with an ordinance providing for the segregation of white and colored people in different residential districts of the City of Baltimore, although the ordinance was struck down by this Court on other grounds, it was held that it was a valid exercise of the police power on the ground that it tended to preserve peace and prevent conflict and ill-feeling between the white and colored races in that city and to promote its general welfare; but that conclusion was reconsidered in *Jackson v. State*, 132 Md. 311.

In *Osborn v. Grauel*, 136 Md. 88, the Court dealt with the propriety of the action of the mayor of Baltimore City in refusing to approve an application for a building permit for the erection of a garage, and it was there held that the refusal was justified under the welfare clause of the city charter, and the Court in sustaining such refusal referred to *Storer v. Downey*, 215 Mass. 273, where a similar refusal was justified because of the increased fire hazard and the disagreeable incidents of a garage.

In *Farmer & Planters Co. v. Salisbury*, 136 Md. 617, it was held that an ordinance of that municipality forbidding the erection of buildings without a permit was a valid exer-

cise of the police power granted to it by the General Assembly.

These cases state no new law and the principles announced in them were formerly accepted as sound by the decided weight of authority. But for some time past there has been a steady and constant pressure on the courts to modify them so as to permit encroachments upon individual rights which would not have been tolerated in earlier periods of our history, which completely justifies the comment of Mr. Justice Holmes which we have quoted.

One of the most striking manifestations of this tendency is the great volume of so-called zoning legislation which has in recent years been written into the laws of the several states, of which the ordinance before us is an apt illustration and which subject private property to an infinite variety and number of restrictions limiting its use, many of which rest for sanction upon no more definite or substantial foundation than that they are supposed to be in the interest of general prosperity or the public convenience. That the right to hold, enjoy and use property is not absolute but subject to the police power of the State is axiomatic (6 *R. C. L.* 194), and that that power may be affected by changing conditions is inevitable and unquestionable, for a use which at one time may be inoffensive and harmless may at another affect the security or the welfare of others with equal rights, and one of the sources of the police power is the maxim, *"Sic utere tuo ut alienum non laedas."* So, property in a populous urban community may be properly subjected to restrictions which would be unreasonable and arbitrary in a thinly settled rural community, so long as the restrictions bear some definite relation to the protection of the public health, morals, safety or comfort. These principles are self evident and are almost universally accepted. But the question before us goes much further than that. It is whether the power to hold, use and enjoy property can be restricted or taken away by the State under the guise of the police power for purely aesthetic reasons or for any such elastic and indeterminate object as the general prosperity without compensation.

Upon that question the authorities are in sharp conflict, and the extent of that conflict may be illustrated by reference to some of the cases in which the validity of ordinances similar to that involved in this case has been considered.

Because of the high standing and wide learning of the court which decided them the cases most frequently cited in support of the validity of such ordinance are those of the Supreme Judicial Court of Massachusetts. The force of those cases is to some extent affected by the fact that the ordinances involved in them were authorized by a specific provision of the state constitution, but they nevertheless illustrate the extreme length to which the police power must be carried to support some of these laws. In *Inspector of Buildings v. Stoklosa,* 250 Mass. 52, decided October 18th, 1924, that court supported the right of the City of Lowell to divide its territory into zones to restrict the use of buildings for trade industry, tenements and dwellings within such zones, and to require such buildings to conform to regulations as to their construction and use. In *Brett v. Building Commissioner of Brookline,* 250 Mass. 73, decided the same day, it was held that although Brett had been granted a permit by the proper authorities to build "two family" houses on lots in the City of Brookline, and had actually begun their erection, that the permit could be revoked and their completion prevented under an ordinance passed after the contracts for building them had been made, and work on them commenced. In *Spector v. Building Inspector of Milton,* 250 Mass. 63, decided on the same day, the petitioner had bought land and located in Milton for the purpose of erecting a block of twelve stores. There was then a building code but no zoning law in force there, and he applied for a permit to build the stores. This permit was withheld for the express purpose of delay until the selectmen could have adopted a zoning ordinance declaring the property to be within a "residence" district. The ordinance was adopted and the permit refused, and in sustaining that action the court in part said: "The circumstances that the land of the petitioner could be used more profitably for commercial than for residential

purposes is of slight significance and of no consequence in the broad aspects of the case. Every exercise of the police power in respect to the use of land is likely to affect adversely the property interests of somebody."

Other cases sustaining laws having some provisions similar to those in question here are *State ex rel. Civello v. New Orleans,* 154 La. 271; *Lincoln Trust Company v. Williams Building Corporation,* 229 N. Y. 313; *Ware v. Wichita,* 113 Kan. 153, in which this language is found: "The next contention is that the zoning ordinance and the statute which authorizes it have the effect of taking defendant's property or of diminishing its value without compensation. It often happens that a valid exercise of the police power has such effect. The most common examples of this are found in statutes and ordinances relating to the health, safety, or morals of the people. With the march of the times, however, the scope of the legitimate exercise of the police power is not so narrowly restricted by judicial interpretation as it used to be. There is an aesthetic and cultural side of municipal development which may be fostered within reasonable limitations." *State v. Harper,* 182 Wis. 148, in which this interesting exposition of the modern doctrine of the police power is found: "The benefits to be derived to cities adopting such regulations may be summarized as follows: They attract a desirable and assure a permanent citizenship; they foster pride in and attachment to the city; they promote happiness and contentment; they stabilize the use and value of property and promote the peace, tranquility and good order of the city. * * * It is not necessary for us to consider how far aesthetic considerations furnish a justification for the exercise of the police power. But one case has been called to our attention which holds that aesthetic considerations alone justify the exertion of that power. * * * Perhaps the case of *State v. Houghton,* 144 Minn. 13, 174 N. W. 885, 176 N. W. 159, goes nearly if not quite as far. Other cases hold that aesthetic reasons may be taken into consideration, but that they cannot furnish the substantial basis for the exercise of the power. * * * It seems to us that aesthetic considerations

are relative in their nature. With the passing of time, social
standards conform to new ideals. As a race, our sensibilities
are becoming more refined, and that which formerly did not
offend cannot now be endured. * * * The rights of property
should not be sacrificed to the pleasure of an ultra-aesthetic
taste. But whether they should be permitted to plague the
average or dominant human sensibilities well may be pon-
dered."

Some of the provisions of several of the statutes reviewed
in these cases bore no necessary relation to the public health,
morals, safety or welfare, and manifestly owed their existence
to an intention to create certain areas within which persons
might reside without fear of being annoyed by the proximity
of other dwellings and business enterprises which, while not
affecting the public health, the public morals, the public
safety, or the public welfare, were nevertheless repugnant
to the aesthetic sensibilities of that part of the public in
whose interest they were drawn. That such a purpose could
not be effected if the usual constitutional guaranties are
given their ordinary meaning is clear, since in such a case
the purpose could only be effected through resort to the power
of eminent domain, which would in practice be impossible,
and hence it was necessary to support them by an extension
of the police power, either in terms, or by some process of
reasoning often tenuous and remote, to establish some rela-
tion between the laws and some recognized element of the
police power.

There are, however, cases in which the power of the state
to adopt legislation impairing property rights for any reason
less substantial than the protection of the public health,
safety, morals or welfare, has been denied.

In *Fitzhugh v. Jackson,* 132 Miss. 585, 33 A. L. R. 279,
the court was dealing with an ordinance making it unlawful
for any one to start a new business enterprise within a resi-
dence district unless with the consent of the owners of more
than one half the property within a certain distance from the
lot affected and the city council. The petitioner in that case
applied for a permit to erect a building for a grocery store.

It was refused on the ground that such a use was forbidden by the ordinance. In passing upon the validity of the ordinance, the court said: "The proper operation of a grocery store cannot possibly be injurious to the public health. One of the ordinary uses of property is for personal gain, and in the lawful use of this property the individual is protected by the constitution. He must so use it as not to injure others. By using this property for the purpose of conducting a retail grocery store in a lawful manner, he does not injure, in the legal sense, the property of his neighbor. * * * We doubt, but do not here decide, that under our constitution the state under the police power has the right to pass regulations purely to promote the public convenience or the general prosperity, to the disadvantage and detriment of the individual property holders." In *Spann v. Dallas,* 111 Tex. 350, 19 A. L. R. 1387, the question presented was stated by the court in this way: "Whether under the authority of the police power the citizen may be denied the right to erect, and in effect the right to own, a storehouse in a residence portion of a city, for the conduct of a lawful, inoffensive, and harmless business." In discussing that question it said in part: "Property in a thing consists not merely in its ownership and possession, but in the unrestricted right of use, enjoyment, and disposal. Anything which destroys any of these elements of property to that extent destroys the property itself. The substantial value of property lies in its use. If the right of use be denied, the value of the property is annihilated and ownership is rendered a barren right. Therefore a law which forbids the use of a certain kind of property strips it of an essential attribute and in actual result proscribes its ownership. The police power is a grant of authority from the people to their governmental agents for the protection of the health, the safety, the comfort, and the welfare of the public. * * * While this is true, it is only a power. It is not a right. The powers of government, under our system, are nowhere absolute. They are but grants of authority from the people, and are limited to their true purposes. The fundamental rights of the people are inherent and have not been

yielded to governmental control. They are not the subjects
of governmental authority. They are the subjects of indi-
vidual authority. Constitutional powers can never transcend
constitutional rights. The police power is subject to the limi-
tations imposed by the constitution upon every power of
government; and it will not be suffered to invade or impair
the fundamental liberties of the citizen, those natural rights
which are the chief concern of the constitution and for whose
protection it was ordained by the people. * * * To secure
their property was one of the great ends for which men
entered into society. The right to acquire and own property,
and to deal with it and use it as the owner chooses so long as
the use harms nobody, is a natural right. It does not owe its
origin to constitutions. It existed before them. It is a part
of the citizen's natural liberty—an expression of his free-
dom—guaranteed as inviolate by every American Bill of
Rights. It is not a right, therefore, over which the police
power is paramount. Like very other fundamental liberty,
it is a right to which the police power is subordinate." In
*State v. McKelvey,* 301 Mo. 1, in dealing with a compre-
hensive zoning ordinance regulating the use of property and
dividing the the City of St. Louis into five use districts,
the court held that it was not within the scope of the police
power. A like conclusion was reached upon somewhat sim-
ilar facts in *Ignaciunas v. Risley,* 98 N. J. L. 712, by the
Supreme Court of New Jersey, and upon appeal to the Court
of Errors and Appeals of New Jersey it was held that the
mere erection of a store building within a residence district
fixed by a zoning ordinance did not endanger the public
health safety or general welfare. 125 Atl. 121. In *State
v. Houghton,* 134 Minn. 226, it was held that a zoning ordi-
nance prohibiting the erection of any building except for
residential purposes in a residence district could not be sus-
tained under the police power, in so far as it applied to ordi-
nary store buildings, and to the same effect is *Willison v.
Cooke,* 54 Col. 320.

From what we have said, the cases last cited which deny
to the state the right to restrict the use of private property

unless the restriction bears some definite and substantial relation to the public health, morals, safety, or welfare, are in accordance with the views repeatedly expressed by this Court, and from which it will not now depart.

We will now apply the principles stated in these decisions and in the decisions of this Court to the matter immediately before us, which is, whether these provisions of ordinance No. 922 of Baltimore City, which regulate the use of property in residence districts in that city, are in so far as they apply to the use of the appellant's property a valid exercise of the police power.

From an examination of the maps which form a part of the ordinance, it appears that the residence zones or districts of Baltimore City comprise a number of separated areas varying in extent, irregular in outline, and located without apparent reference to any definite plan, but which nevertheless in the aggregate include a very large part of the total area of that city. And by reference to the ordinance it appears that in those districts no land or building can be used and no buildings erected except for one of fifteen specified uses, to which reference has already been made, unless specially authorized by the board of zoning appeals. These restrictions are wholly arbitrary and have no logical relation to the public welfare, but rest solely upon aesthetic grounds. Under the provisions of sections 3 and 7d and 7g of article 3 of the ordinance, a neighborhood drug store might be forbidden, and a crematory permitted, a bakery forbidden and a sewage disposal plant permitted, an office building prohibited and a refuse dump permitted, a grocery store forbidden and an amusement park allowed. Nor is there any rule or standard prescribed to guide the discretion of those entrusted with the administration of the ordinance in deciding what shall be allowed or what forbidden any more definite than that, in any departure from the letter of the law, the spirit of the ordinance shall be preserved, public safety and welfare secured, and substantial justice done. But as the ordinance itself is based upon the theory that its prescriptions are in the interest of the public welfare, it is not clear how any departure from them can

be justified on that ground, for if the restrictions are not necessary to the public welfare, there can be no justification for them at all, and in fact there is none. Their only apparent purpose was to prevent the encroachment of business establishments of any kind upon residential territory, regardless of whether they affected in any degree the public health, morals, safety, or welfare. In effecting that purpose they take from the property owner the right to use his property for any purpose not sanctioned by the letter of the ordinance or allowed by the practically unfettered discretion of the board of zoning appeals, and deprive him of privileges guaranteed by the twenty-third article of the Maryland Bill of Rights.

We have reached the conclusion, therefore, that so much of the ordinance as attempts to regulate and restrict the use of property in Baltimore City is void: first, because it deprives property owners of rights and privileges protected by the Constitution of the State; second, because such deprivation is not justified by any consideration for the public welfare, security, health, or morals apparent in the ordinance itself; and third, because it does not require that the restrictions shall in fact be based upon any such consideration. But in reaching this conclusion we do not hold that the use of property in Baltimore City may not be regulated or restricted where such regulation or restriction is based upon such consideration.

In view of this conclusion it becomes unnecessary to deal with those provisions of the ordinance which undertake to regulate the height of buildings and the areas of yards and open spaces adjacent thereto, as well as the number of families who may dwell thereon. Whether those provisions are valid may depend upon facts which are not before us, for this Court has decided that regulations of that general character may be enforced where they are needed for the protection of the public safety, health, or morals, and whether in a given case they are so required must depend upon the circumstances of that case. And although there is no apparent relation between some of the provisions of the ordinance,

which prescribe the area which buildings may occupy and limit the number of persons who may reside upon a given area, and any legitimate exercise of the police power, nevertheless we refrain from passing upon the validity of those provisions, because it may be possible that conditions of which we are not informed by the record may affect their validity.

Another objection to the ordinance is that it improperly extends the jurisdiction of the Baltimore City Court, but we do not think that that contention can be sustained.

Article 4, section 39, of the Constitution of Maryland provides that "the General Assembly may reapportion, change or enlarge the jurisdiction of the several courts" of Baltimore City. Article 11A of that Constitution provides that the Mayor and City Council of Baltimore shall have full power to enact local laws of said city." That this is a "local law" can hardly be questioned, nor can there be any doubt but that the General Assembly could have provided for an appeal from the board of zoning appeals to the Baltimore City Court. And since by the direct mandate of the people the Mayor and City Council of Baltimore is given the right to enact local laws, there seems to be no reason why they have not the same power which the General Assembly has to provide for such judicial hearings as may be deemed proper and necessary to the administration of such laws. Any other construction would tend to nullify the purpose of the Home Rule Amendment, for if the city has not the power to provide for such judicial hearing and review as may be necessary to the proper administration of such laws as they may pass under that amendment, its power to legislate would be incomplete and abortive. And when it was given the power to legis-. late it must necessarily have been given at the same time such powers as were essential to make that power effective. And since. in many instances a judicial hearing and review of questions arising under such legislation is essential to the validity thereof, it must have been intended that it should have the power to provide therefor. And that such is the construction which this Court has placed upon that provision of

the Constitution is intimated, if not expressly decided, in *State etc. v. Rutherford,* 145 Md. 163. In reaching this conclusion, however, we are not to be understood as deciding that the jurisdiction vested in the Baltimore City Court upon appeal by this ordinance is a valid exercise of that power, nor that that court can be required to exercise any other than judicial functions.

A further objection is that the power granted to the board of zoning appeals to disregard and in effect set aside the provisions of the ordinance in particular cases is too arbitrary and indefinite to be sustained. From what we have said it follows that in our opinion the real objection to that delegation of power is not that it commits to that board a discretion, for that may be essential to any proper administration of the law, but that it fails to provide any proper standards or rules by which the exercise of that discretion must be guided and limited in so far as it applies to the "use" provisions of the ordinance, and if it were necessary to decide that question in this case, we would hold it to be invalid in so far as it applied to those provisions. For reasons already given, however, we are not called upon to decide whether it is invalid in so far as it applies to the height and area restrictions, and we will not pass upon that question, further than to say that it does not necessarily follow that, because the standards and rules provided to control the exercise of the discretion vested in the board in passing upon the uses of property are too indefinite, that they are insufficient to limit and control that discretion when applied to the location and construction of buildings. For in the one case, the subject of the discretion is intangible, impalpable, and aesthetic, while in the other it is material and substantial, and its physical incidents and consequences are capable of being positively and definitely ascertained. "Practical difficulties," and "unnecessary hardships" may have a definite meaning when applied to the construction of a building, but are quite meaningless when applied to the effect which the proximity of a small tailor shop may have on the aesthetic sensibilities of persons in its vicinity.

The record before us is unsatisfactory in that it does not show affirmatively that the petitioner has complied with all the requirements prerequisite to the issuance of the permit applied for, but from the agreed statements of fact we have assumed that he has, and that the permit was refused solely on the ground that the business which he proposes to operate is in a residence district. If there was no other ground than that for its refusal it should have been issued, but because that does not clearly appear the order appealed from will be reversed, and the cause remanded for such further proceedings in accordance with the views expressed in this opinion as may be proper.

> *Order reversed, with costs, and cause remanded for further proceedings.*

BOND, C. J., filed the following dissenting opinion, in which URNER, J., concurred.

It is always well to remind ourselves how limited is the function of a court in such an inquiry as this. The judges have not been commissioned by the people to survey the conditions existing in the State or city from time to time and decide what governmental regulation is desirable and wise for the future. To the legislative branch of the government, and in this connection to the officials of the city government, that function has been given in its entirety. And on any question of the desirability or wisdom of future regulation the conclusion of that branch of the government, and of that branch only, is called for. The courts can, in any instance, consider only the narrow question whether provisions of the constitutions of the United States or the State prohibit the action decided upon by the legislative branch; and in this particular case, consider only whether the constitutional provision that individuals shall not be deprived of their property without due process of law, or, as the State Constitution has it, "but by the law of the land" (article 23 of the Bill of Rights), is

contravened by the zoning ordinance which the city government has decided upon and passed. And if that step is one dictated by the judgment of the proper legislative officials in an attempt to exercise the function committed to them, with any foundation for their concluding that the health, morals, safety, or welfare of the community which they have to care for demand it, then there would be no ground for declaring the constitutional provisions violated. The ideas of the court on the reasonableness of the measure have no bearing. In the case of *State v. Hyman*, 98 Md. 596, this Court had to consider the validity of an act of Legislature for the regulation of tailoring establishments, and Chief Judge McSherry, in passing on the questions now raised, adopted this statement of the law: "'For it must now be considered as an established principle of law in this country, that there are no limits whatever to the legislative powers of the State, except such as are prescribed in their own constitutions or in that of the United States; consequently, that the courts, in the performance of their duty to confine the legislative department within the constitutional limits of its power, cannot nullify and avoid a law, simply because it conflicts with the judicial notions of natural rights or morality or abstract justice.' *Parker & Worthington, Public Health & Safety*, sec. 8, and cases cited in note 2. * * * The Legislature being the sole depository of the law making power, it is not for courts of justice to say that a given enactment passed in virtue of the police power, and having a direct relation to it, is void for unreasonableness, because if courts undertook to exercise such an authority they would in effect exert a veto on legislation." "It is to be remembered," said the Supreme Court of the United States, in *Hadacheck v. Los Angeles*, 239 U. S. 394, "that we are dealing with one of the most essential powers of government, one that is the least limitable. It may, indeed, seem harsh in its exercise, usually is on some individual, but the imperative necessity for its exercise precludes any limitation upon it when not exerted arbitrarily."

The development of city plans and zoning ordinances is a recent one, and does involve a considerable extension of the

power to restrict an individual's use and control of his property. There have, of course, been restrictions imposed in the past, growing with the problems which have arisen as the city has grown. Disturbances have been repressed; noises, smells, smoke restricted for the comfort and convenience of other citizens, and sanitary restrictions imposed. But this ordinance is concerned, not with any such injurious uses of properties. Other ordinances have already provided for those things. This one is concerned with a mere difference in the character of activity on the premises, business or dwelling, with the mere presence of the one or the other in the specified areas. The portion of the ordinance with which we now have to deal is a deliberate effort to separate the business of the city from the dwellings in so far as that is practicable in an old city. That is precisely what we are to consider, and all we are to consider. And we are to decide whether the deprivation of any owners of so much of their freedom in the control or use of their properties in order to accomplish that end can be considered within the scope of the powers committed to the government.

The first objection is based upon the supposition that, in respect to uses which are not nuisances, the ordinance has for its object merely an aesthetic improvement. With time and the increase of general prosperity and comfort, it has become increasingly difficult to draw any reasonable distinction between annoyance and discomfort through one sense, such as smell, and that through some other senses that may be described as aesthetic ones. And however it may be analyzed, there is a widespread dislike of having business uses invade residence districts, to such a degree that the entry of any business use, with its threat of further business development, is a source of distress to many owners of homes, and tends to cause depreciation and sacrifice of the homes. The fact is that the conceptions of the people as to the comfortable and desirable mode of living have been changing; the dwelling places generally desired by city dwellers now are those in more open areas, more or less gardened, and removed from business activities; in about the same conditions;

indeed, as those which the present ordinance attempts to establish for homes within the city limits. This modern preference is strong, and it will prevail to the extent of taking dwellers beyond the city limits to live if they cannot get the desired conditions inside the limits. Rapid transit enables them to live outside the city while continuing to work in it, and a greatly increasing number are doing so. For a long time now, efforts have been made in the development of new residential areas in the city to prevent the environment objected to by covenants in deeds, but this has not proved entirely successful; and, if successful, restrictions by this means are not entirely desirable, because they continue and bind the areas to which they are applied indefinitely in the future, in spite of almost all change, and so may become too burdensome to property owners there in course of time. In 1912 an act of assembly (chapter 693) was resorted to for the protection of an area being developed in the northwestern portion of the city by requiring that houses there be built entirely detached, ten feet apart if built of masonry, twenty feet apart if of frame; but this was held beyond the power of the State government, because there was no substantial reason for treating the one kind of building or the other as affecting the health or welfare of the citizens, which it was the duty of the State to protect, and the Legislature could not for purely aesthetic purposes invade property rights that are guaranteed by the Constitution. *Byrne v. Md. Realty Co.,* 129 Md. 202. The present general ordinance is, apparently, the next step.

This aversion to the proximity of business uses may all be without any basis in reason, but it is nevertheless real, and the law cannot disregard the real importance of the illogical in practical affairs. In *Baltimore v. Fairfield,* 87 Md. 352, in which relief was sought by neighbors from the proximity of a leper duly placed out to board among them by the city, Judge McSherry, for this Court, replying to an argument that the evidence showed the danger of contagion to be negligible, said: "It is not, in this case, so much a mere academic inquiry as to whether the disease is in fact highly or re-

motely contagious; but viewed as it is by the people generally, its introduction into a neighborhood is calculated to do a serious injury to the property of the plaintiff there located." And the cases which have sustained ordinances against the opening of undertaking establishments in residence districts, or have without ordinances held such a use properly enjoined, have proceeded upon a similar recognition of the materiality of some aversions which are not based upon physical injury. *Saier v. Joy,* 198 Mich. 295; *Meagher v. Kessler,* 147 Minn. 182; *St. Paul v. Kessler,* 146 Minn. 124; *Osborn v. Shreveport,* 143 La. 932; *Beisel v. Crosby,* 104 Neb. 643; *Cunningham v. Miller,* 178 Wis. 22; *Tureman v. Kitterlin,* 304 Mo. 221. And see note 23 A. L. R. 745. The authorities are not in agreement on the power to enjoin that use, however. *Westcott v. Middleton,* 43 N. J. Eq. 478; *Koebler v. Pennewell,* 75 Ohio St. 278. The upholding of ordinances directed against Chinese laundries affords another illustration. *Barbier v. Connolly,* 113 U. S. 27; *Soon Hing v. Crowley,* 113 U. S. 703.

If any kind or degree of aesthetic regulation is ever to be within the legitimate powers of government, the principle controlling it cannot be formulated as yet, and we are not authorized to declare it to be so. This has been decided in *Stubbs v. Scott,* 127 Md. 86; *Byrne v. Maryland Realty Co.,* 129 Md. 202; and *Osborne v. Grauel,* 136 Md. 92. And see *Opinion of the Justices,* 234 Mass. 597, and *St. Louis Poster Adv. Co. v. St. Louis,* 249 U. S. 269; *contra, State v. New Orleans,* 154 La. 271. But is the Court at liberty to assume that an aesthetic purpose was the only one, or even that it was the predominant purpose, in the enactment of the present ordinance? We have not, of course, heard any of the discussions which are reported in the agreed statement of the parties here to have led to the adoption of the ordinance, and we are not informed of the problems which may have been suggested in the routine of the work of the various officials of the city, and which the present plan is expected to solve. We have only vague information of problems which have already arisen in still larger cities, and for which Balti-

more should, therefore, be preparing. Can we confidently say from our own experience that there cannot have been any utilitarian or administrative ends which were thought by the promotors of the plan to demand the separation of business and dwellings as a larger method of handling the congested·population with which the officials will have to deal in the future? May not the rapid changes in city traffic problems be met more easily by some such plan? And with the increased difficulty of suppressing crime brought about by the use of automobiles for sudden arrival and flight, may there not be some aid for the meeting of police problems in the zoning plan? Or, more accurately, could not the officials of the city have thought so? And may it not be that the stresses and strains of living in a large modern city, with all its complex activities, have grown to a point where the separation of business from dwelling places offers a material, or even necessary, aid in the maintenance of the health and vigor of the city population? May it not be that in the growth of our predominantly industrial civilization we have arrived at a point where special protection is needed for the mere business of living? And is it not permissible to make some arrangement for a crowded city population which promises an improvement over the haphazard jumble which may now result from the uncontrolled wills and interests of neighboring owners? A city is a joint enterprise, and co-operation is almost the first law of its population if their joint living place is to be kept tolerable as the congestion of affairs in it increases. And if we regard property owners as holders of abstract rights, the same in the country as in a city, we may reverse the process to which they commit themselves as residents or beneficiaries of the city.      In *Opinion of the Justices,* 234 Mass. 597, the Supreme Judicial Court of Massachusetts said on this point: "We do not think it can be said that circumstances do not exist in connection with the ordinary operation of such kinds of business which increase the risk of fire, and which render life less secure to those living in homes in close proximity. Health and security from injury of children and the old and feeble and

otherwise less robust portion of the public well may be thought to be promoted by requiring that dwelling houses be separated from the territory devoted to trade and industry. The suppression and prevention of disorder, the extinguishment of fires and the enforcement of regulations for street traffic, and other ordinances designed rightly to promote the general welfare, may be facilitated by the establishment of zones or districts for business as distinguished from residence. Conversely, the actual health and safety of the community may be aided by excluding from areas devoted to residence the confusion and danger of fire, contagion and disorder, which in greater or less degree attach to the location of stores, shops and factories. Regular and efficient transportation of breadwinners to and from places of labor may be expedited. Construction and repair of streets may be rendered easier and less expensive if heavy traffic is confined to specified streets by the business there carried on." And to the same effect are the subsequent decisions in *Inspector of Buildings of Lowell v. Stoklosa,* 250 Mass. 250, and *Spector v. Building Inspector of Milton,* 250 Mass. 63. And to the same effect is *State v. New Orleans,* 154 La. 271.

When we come to examine the previous decisions in Maryland, we find that in *Easton v. Covey,* 74 Md. 262, the denial of the permit to establish a livery stable, because it was unsuitable to its surroundings in Easton, was upheld in an opinion by Judge Miller. In *State v. Hyman,* 98 Md. 596, the Court found an act for regulation of tailoring establishments to be within the police power of the Legislature; and that case was upon closely similar facts. It prohibited tailoring in dwellings except where licensed by a public official, and vested in that officer a discretion in granting or refusing permits which, on the face of the act, was almost unlimited. And the grounds of attack were also closely similar to those in the present case. Many other occupations have likewise been lawfully subjected to regulation; and public utility regulation is a familiar recent exercise of the police power. *Gregg v. Public Service Commission,* 121

Md. 1.   The Supreme Court of the United States has upheld a prohibition of the continued manufacture of bricks in a restricted district (*Hadacheck v. Los Angeles,* 239 U. S. 394) ; of a livery stable (*Reinman v. Little Rock,* 237 U. S. 171) ; and of bill boards (*Cusack Co. v. Chicago,* 242 U. S. 526).   And somewhat in advance of most of these decisions is that in the case of *Cochran v. Preston,* 108 Md. 220, in which a restriction on the height of buildings to be erected on Mt. Vernon Place in Baltimore City was held valid; and that in *Osborne v. Grauel,* 136 Md. 91, which upheld a refusal to issue a permit for a garage because the Mayor did not "think garages ought to be built in that community; that it was a very nice class of property out there and that these garages would depreciate the value of the property * * * and that the character of the proposed buildings did not conform to the other improvements in the neighborhood."   In the case of *Cochran v. Preston, supra,* the Court found that the statute might be justified as necessary to meet a fire hazard of special seriousness, but the propriety of the restriction if intended to accomplish a purely aesthetic purpose was discussed, and in denying it the Court, page 229, said, "Such is undoubtedly the weight of authority, though it may be that in the development of a higher civilization, the culture and refinement of the people has reached the point where the educational value of the fine arts, as expressed in architectural symmetry and harmony, is so well recognized as to give sanction, under some circumstances, to the exercise of this power even for such purposes."

Upon these considerations, the conclusion of Judge Urner and myself on the first and main question, whether this ordinance can be said to have a purpose which it is the function of the government to effectuate, is that it can be.   We take the view that the possibilities pointed out for improvement in living conditions, and in the handling of administrative problems, may well have justified the adoption of the separation of business and the dwelling places for the future, under the police power, and that this measure of co-operation required of the citizens is one which the judges cannot say is

arbitrary or unnecessarily oppressive. And, proceeding from this conclusion, we think, further, that the vesting of so wide a discretion in the board of zoning appeals by the provisions of the ordinance cannot properly be held an unconstitutional delegation of legislative power.

The nature and magnitude of the undertaking do, as the majority opinion points out, give rise to difficulties in accomplishing it, of legal as well as of practical importance. Discrimination among the many thousands of situations, of particular properties, and of possible uses, is, of course, impracticable, so that the work can be done only by broad classifications, with inevitable disregard of some differences, and presumably with inevitable hardship and injustice in some cases. And as the conditions to be dealt with in such a living city are transitory, no fixed arrangement can be made for them. An agency with little limitation upon its discretion and freedom of action must be set up, and might soon become the chief immediate source of the law and of its administration. But it seems sufficiently clear that the effort is to make necessary adaptation within the limits of the plan and purpose indicated in the ordinance, and it is restrained by a provision for appeal. There is nothing novel in the device, nor in the breadth of the discretion delegated. Legislation which has to provide for a large number of special cases of varied facts, or for unforseeable conditions present or future, must be supplemented by the action of administrative officers with power to adapt and vary the rule as the special cases come before them, one by one. If this were not permissible, then the legislative branch of the government could not deal with some of the needs of the country or of the community at all, for it can be done in no other way. As early as 1794, Congress passed an act which gave the President power to lay an embargo on shipping "whenever in his opinion, the public safety shall so require," and under regulations to be continued or revoked "whenever he shall think proper." So another act later conferred upon the President authority to reduce revenue and equalize duties on imports, and for other purposes to suspend by proclamation the free introduction of

sugar, molasses, coffee, tea and hides, when he is satisfied that
any country producing such articles imposes duties or other
exactions upon the agricultural or other products of the
United States which he may deem to be reciprocally unequal
or unreasonable; and it was held a valid delegation of power.
*Field v. Clark,* 143 U. S. 649. A statute which declared its
purpose to exclude the lowest grades of tea from importa-
tion, and then left it to the Secretary of the Treasury to
determine the standards to be applied, was held valid. *Butt-
field v. Stranahan,* 192 U. S. 470. Chief Justice White, in
the opinion of the Court in that case, said: "Congress
legislated on the subject as far as was reasonably practicable,
and from the necessity of the case was compelled to leave to
executive officials the duty of bringing about the result
pointed out by the statute. To deny the power of Congress to
delegate such a duty would, in effect, amount but to declar-
ing that the plenary powers vested in Congress to regulate
foreign commerce could not be efficaciously exerted." And
again, in *Union Bridge Co. v. United States,* 204 U. S. 387,
the Court said: "Indeed, it is not too much to say that a de-
nial to Congress of the right, under the Constitution, to dele-
gate power to determine some fact or the state of things upon
which the enforcement of its enactment depends would be
'to stop the wheels of government' and bring about confusion,
if not paralysis, in the conduct of business." And so, it was
held constitutional for Congress to authorize the Secretary
of War to fix and change harbor lines (*Philadelphia Co. v.
Stimson,* 223 U. S. 605, 635, 638); and to empower the Sec-
retary of Agriculture to make substantive rules and regula-
tions covering forest reservations, and to make criminal the
violation of those rules (*United States v. Grimaud,* 220 U. S.
506). All this may be found in conflict with expressions,
and, indeed, decisions, in earlier cases; but there has been
an enforced growth and change in constitutional conceptions
as to proper delegation of power to governmental agencies.
Senator Elihu Root, who speaks with the authority of a
most profound understanding of our institutions and of the

law, said to the American Bar Association in 1916: "As any community passes from simple to complex conditions the only way in which government can deal with the increased burdens thrown upon it is by the delegation of power to be exercised in detail by subordinate agents, subject to the control of general directions prescribed by superior authority. The necessities of our situation have already led to an extensive employment of that method. The Interstate Commerce Commission, the State Public Service Commissions, the Federal Trade Commission, the powers of the Federal Reserve Board, the health departments of the states, and many other supervisory offices and agencies are familiar illustrations. Before these agencies the old doctrine prohibiting the delegation of legislative power has virtually retired from the field and given up the fight. There will be no withdrawal from these experiments. We shall go on; we shall expand them, whether we approve theoretically or not, because such agencies furnish protection to rights and obstacles to wrongdoing which under our social and industrial conditions cannot be practically accomplished by the old and simple procedure of legislatures and courts as in the last generation." And he then proceeded to emphasize the necessity of having the agencies themselves held under rule. There may be more fight left in the doctrine prohibiting the delegation of legislative power than is here conceded, but that there has been at least a change of line seems unquestionable. The discretion under the zoning ordinance is, after all, little or no greater than that vested in the Public Service Commission for its work. We must assume a disposition on the part of the board. to act justly, and if it fails to do so, there is a remedy by appeal, with a jury trial if desired. *State v. Rutherford,* 145 Md. 363. Therefore the danger of oppression seems sufficiently guarded against. The possibility of differences in the standards of different juries does not make the appeal objectionable or unsatisfactory to the individual property owners in whose interest the constitutionality of the ordinance is questioned. In *State v. Hyman, supra,* to which reference has been made several times because of its points

of similarity, Judge McSherry, for the Court, answered much the same objection on the breadth of the administrative discretion thus: "Tested by the principles hereinbefore announced we find nothing in the Act of 1902 which indicates that its design, its purpose or its details have not a real and substantial relation to the police power. It may be conceded that some of those provisions, if harshly administered may be or become oppressive, but it by no means follows that the law itself is therefore not a legitimate exercise of the police power. It is not to be assumed that the public functionary will act in an oppressive or unlawful manner. Discretion must be reposed somewhere. If an official should transcend the legitimate limits of the authority with which the statute clothes him, the injured party is not without redress. Laws are to be upheld rather than stricken down. Every intendment must be made by the courts in favor of the constitutionality of a statute."

It is for these reasons our conclusion on the constitutional objections raised has differed from that of the majority.